# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

PAUL MURHY et al.,

       *Plaintiffs,*

       v.

KWAME RAOUL* et al.,

       *Defendants.*

)
)
)
)
)
)
)
)
)
)

No.  16 C 11471

Judge Virginia M. Kendall

## MEMORANDUM OPINION AND ORDER

Paul Murphy is indigent and homeless.  He was convicted of possession of child pornography in 2012 and received a sentence of three years' probation.  Five years after his release date, and nearly twice the number of years of his sentence, he remains incarcerated because the Department of Corrections cannot find an appropriate place for him live.

Illinois, like many states, requires sentencing courts to follow a term of imprisonment with a term of mandatory supervised release.  Supervised release is a form of post-confinement monitoring intended to assist individuals in their transition from prison to liberty.  Most supervised release terms are determinate, but some—including those that apply to several sex offenses—are indeterminate, meaning they range from three years to natural life.  The clock on these terms does not start ticking until

---

* Because Kwame Raoul became the Attorney General of Illinois on January 14, 2019, he automatically substitutes in as a defendant. *See* Fed. R. Civ. P. 25(d).

sex offenders are out of prison, but some never make it that far because they are indigent and the State demands that they first secure a qualifying host site before it will release them. Many offenders successfully complete their entire court-ordered terms of incarceration yet remain detained indefinitely because they are unable find a residence due to indigence and lack of support.

The question presented is whether this practice violates the Constitution. The plaintiffs are a class comprising the affected sex offenders and the defendants are the Attorney General of Illinois and the Director of the Illinois Department of Corrections. Both parties moved for summary judgment. (Dkts. 75, 88.) The Court now grants the plaintiffs' motion (Dkt. 75) in part, denies it in part, and denies the defendants' cross-motion in full (Dkt. 88). At the very heart of the liberty secured by the separation of powers is freedom from indefinite imprisonment by executive decree. The Attorney General and Director's current application of the host site requirement results in the continued deprivation of the plaintiffs' fundamental rights and therefore contravenes the Eighth and Fourteenth Amendments to the Constitution of the United States.

## BACKGROUND

In Illinois, almost every criminal sentence includes a mandatory supervised release ("MSR") term that follows the term of imprisonment. *See* 730 ILCS 5/5-4.5-15(c). Most MSR terms are determinate, meaning the Legislature sets a finite number of years for the offender to serve. Some terms, however—including those that attach to certain sex offenses—are indeterminate, "rang[ing] from a minimum of 3

years to a maximum of natural life." *Id.* 5/5-8-1(4)(d). In those cases, sentencing courts must impose an indeterminate term of three years to natural life. *See People v. Rinehart*, 2012 IL 111719, ¶¶ 29–30.

**Statutory Scheme**

The Illinois Legislature vested both the Prisoner Review Board (PRB) and the Department of Corrections (IDOC) with authority over MSR. *See Cordrey v. Prisoner Review Bd.*, 2014 IL 117155, ¶ 20. The Supreme Court of Illinois explained the relationship between the PRB and the IDOC in *Cordrey*:

> The Prisoner Review Board is independent of the Department of Corrections. 730 ILCS 5/3–3–1(a) (West 2012). The Prisoner Review Board is "the authority for setting conditions for parole, mandatory supervised release under Section 5–8–1(a) of this [Unified] Code [of Corrections], and determining whether a violation of those conditions warrant revocation of parole or mandatory supervised release or the imposition of other sanctions." 730 ILCS 5/3–3–1(a)(5) (West 2012).
>
> ¶ 21 The Prisoner Review Board has wide discretion in setting the conditions of MSR. "The conditions of parole or mandatory supervised release shall be such as the Prisoner Review Board deems necessary to assist the subject in leading a law-abiding life." 730 ILCS 5/3–3–7(a) (West 2012). Although the Prisoner Review Board has wide discretion, the legislature has mandated that certain sex offenders are required to wear an approved electronic monitoring device. 730 ILCS 5/3–3–7(a)(7.7) (West 2012).
>
> ¶ 22 While the Prisoner Review Board is the authority for setting conditions for MSR and determining whether a violation of those conditions warrants revocation of MSR, the Department of Corrections retains custody of all persons placed on parole or MSR. See 730 ILCS 5/3–14–2(a) (West 2012). The Department of Corrections "shall supervise such persons during their parole or release period in accord with the conditions set by the Prisoner Review Board. * * * Such conditions may include that the person use an approved electronic monitoring device * * *." 730 ILCS 5/3–14–2(a) (West 2012). Included within the Department's custody are "all sex offenders placed on mandatory supervised release." 730 ILCS 5/3–14–2.5(a) (West 2012). The legislature has directed that the

Department of Corrections "shall assign personnel to assist persons eligible for parole in preparing a parole plan. Such Department personnel shall make a report of their efforts and findings to the Prisoner Review Board prior to its consideration of the case of such eligible person." 730 ILCS 5/3–14–2(b) (West 2012).

¶ 23 A parolee or releasee's supervising officer "shall report violations to the Prisoner Review Board and shall have the full power of peace officers in the arrest and retaking of any parolees or releasees or the officer may request the Department to issue a warrant for the arrest of any parolee or releasee who has allegedly violated his parole or release conditions." 730 ILCS 5/3–14–2(c) (West 2012). The Code provides that, "[t]o assist parolees or releasees, the Department shall provide employment counseling and job placement services, and may in addition to other services provide the following: (1) assistance in residential placement." (Emphasis added.) 730 ILCS 5/3–14–3(1) (West 2012).

2014 IL 117155, ¶¶ 20–23. So, the PRB sets the conditions for an inmate's MSR, but the Legislature directed the IDOC to assist inmates with finding a suitable "host site" for residential placement. *See id.* ¶ 24.

Even if the PRB approves an individual for MSR, the IDOC will not extricate that person unless and until he or she satisfies certain conditions, most importantly securing a qualifying host site to reside at while on MSR. (Dkt. 91 ¶ 2.) The IDOC exercises the sole power to approve or deny an inmate's proposed host site based on a variety of statutes and regulations that restrict where sex offenders may live while on MSR. *Id.* ¶¶ 3–5. Ultimately, a parole agent must okay the placement. *Id.* ¶ 4.

In the case of a someone who is labeled a sex offender, a variety of other statutes and rules also kick in to restrict where and how that individual may reside. These include registration laws and regulations that prohibit sex offenders from living a certain number of feet from schools, parks, and day care centers, as examples. The only time a person can apply for the termination of his or her indeterminate MSR

term is after successfully serving three years of that term outside of prison. *Id.* ¶ 5. Taken together, what all this means is that someone who the PRB approves for release after serving his or her entire term of imprisonment will remain indefinitely confined if the individual is unable to identify a host site that passes muster. *Id.*

**Host Site Review**

No more than six months before release, an inmate may propose a host site by giving an address to the field services representative or counselor at the facility who then enters that information into a database. (Dkt. 107 ¶ 1.) Next, the database routes the proposed host site to the appropriate district, where the parole commander verifies the receiving district is correct and that the MSR date of entry is no more than six months away. *Id.* ¶ 2. If those things check out, the commander assigns the host site to a parole agent. *Id.* The assigned agent begins the host site investigation by checking the Department's mapping software for day care centers and schools within 500 feet of the address. *Id.* ¶ 3. If none appear, the agent turns to Google Earth to check for playgrounds, parks, and other facilities providing programs exclusively for minors. *Id.* If any such grounds come up in the search, the agent will generally deny the site. *Id.*

Moving forward, the agent calls the local registering agency, usually the police department, to verify that it will register an offender at the specified address because state law requires it. *Id.* ¶ 4. The police department, in fact, has the authority to arrest and return to IDOC custody a sex offender who violates any of the residency

restriction statutes. *Id.* Thus, if the local police department states that it will not register the offender at that address, the IDOC agent will deny the host site. *Id.*

Following the call with the police department, the parole agent visits the proposed host site. *Id.* ¶ 5. During this visit, the agent looks for day care centers or playgrounds that he or she perhaps missed on the map. *Id.* The agent will also meet with the host, if any, to ensure that he or she is indeed willing to have the offender reside there and understands all the rules. *Id.* ¶ 6. Additionally, the agent will determine who else resides in the house and confirm that any co-owners or co-lease-holders agreed to the offender living there. *Id.* The agent's overarching aim and objective is to ensure that the home will be a good environment, meaning financially and emotionally supportive, physically safe, and structurally sound. *Id.* ¶ 7.

If at any point in the process the agent denies a host site, the parole commander *informally* reviews the denial to make certain that it is reasonable and meritorious. *Id.* ¶ 8; Dkt. 91 ¶ 24. The commander has the prerogative to affirm or reverse the agent's decision. (Dkt. 107 ¶ 8.) But the parties dispute whether there is a *formal* process for a person to contest the decision of a parole agent to deny approval of a host site. (Dkt. 91 ¶ 22; Dkt. 107 ¶ 29.) The plaintiffs claim there is no such procedure through the proper channels in the IDOC, while the defendants state that an offender who disagrees with the denial of a host site may file a grievance at his or her facility. (Dkt. 91 ¶ 22.) In the defendants' view, the counselor or grievance officer at the facility can request that the IDOC Parole Department reinvestigate a denied host site. *Id.* If the objection appears to be meritorious, the Parole Commander can

either ask the original agent assigned to take a second look or may put a new agent on the case to investigate the site. *Id.* The plaintiffs dispute this, asserting again that the IDOC does not treat denials of parole sites as grievable issues. (Dkt. 107 ¶ 30.)

The defendants so state, even though their witness 30(b)(6) witness testified that he did not know whether the denial of a host site is a grievable issue. (Dkt. 91 ¶ 22 (citing in part Pl. Ex. 14, Dep. of Dixon, at 114:20–115:3); Dkt. 107 ¶ 29; Dkt. 128 ¶ 160.) What is more is that the IDOC denied one of the class members' grievances because "'IDOC does not set sex offender laws.'" (Dkt. 91 ¶ 26 (quoting Ex. 21).) The Administrative Review Board denied review of that decision because "'[i]ssues are outside the scope of the ARB.'" *Id.* (quoting Ex. 21). The defendants did not cite a single example of a grievance concerning a host-site denial being reviewed or overturned. (Dkt. 107 ¶ 29.)

An offender may also contact the parole agent's supervisor to request review of the agent's decision. (Dkt. 91 ¶ 23.) But the parties dispute whether anybody advises these individuals of this right or gives them any information about how they can contest an unfavorable disposition. *Id.* The defendants acknowledge that the source the plaintiffs cite for the proposition that offenders never receive notice of this right or any information about potential review does not support that assertion; however, in the same breath they do not provide any evidence suggesting when they are in fact given this information. *Id.* ("While the cited source does not include this information, this does not mean that parolees are never given this information.").

What is clear is that there is no formal PRB procedure that determines whether a parole agent's rejection of a proposed host site was appropriate or not. *Id.* ¶ 25. "The parolee has no opportunity to contest the parole agent's decision(s) to reject proposed housing at a PRB hearing and the PRB does not review the IDOC's decision to reject proposed host sites." *Id.*

**Housing Restrictions**

For at least the first two years of their indeterminate MSR terms, many sex offenders must participate in an electronic home detention program. (Dkt. 91 ¶ 6 (citing 730 ILCS 5/5-8A-3(g).) The parties dispute whether the technology utilized requires a landline. (Dkt. 91 ¶ 6; Dkt. 107 ¶¶ 16, 20; Dkt. 108 ¶ 151; Dkt. 128 ¶¶ 150–51.) By the plaintiffs' account, the IDOC has a "preference" for a landline, but the equipment can function without one so long as cellular service exists in the area. (Dkt. 107 ¶¶ 16, 20; Dkt. 108 ¶ 150.) The PRB may impose additional residential conditions on sex offenders while they are on MSR, such as prohibiting them from "'resid[ing] near . . . parks, schools, day care centers, swimming pools, beaches, theaters, or any other places where minor children congregate'" without the prior approval of the IDOC. (Dkt. 91 ¶ 10 (quoting 730 ILCS 5/3-3-7(b-1)(12).)

The statute does not define "near" and thus leaves it up to the IDOC to exercise its discretion in determining whether a proposed host site is too near an off-limits location. *Id.* That said, the Department generally considers "near" to be 500 feet, consistent with the statute that restricts child sex offenders from residing within 500 feet of schools, playgrounds, and daycare facilities. *Id.* ¶¶ 10, 11 (citing 720 ILCS

5/11-9.3). On top of that, IDOC parole agents have the option to bar a sex offender whose victim was an adult from living near locations where the offender had committed crimes in the past, such as a massage parlor or nail shop. *Id.* ¶ 11.

There is another statute that prohibits one sex offender from residing in the same "condominium complex or apartment complex" as another offender, and the IDOC interprets that to mean that more than one sex offender cannot live in the same trailer park, unless each trailer is on separately-owned land. *Id.* ¶ 12. The IDOC seems to interpret it that way because the Illinois State Police and the Chicago Police Department said it was so. *Id.* ¶ 13.

With respect to computers and other electronics in the home, the IDOC analyzes each request to live at a host site with internet access on a case-by-case basis. *Id.* ¶¶ 14, 17. The plaintiffs dispute this contention because the written policies, by their count, indicate the opposite. (Dkt. 107 ¶¶ 22–24.) The defendants claim that the Department recently promulgated new guidelines that proscribe internet-related sex offenders from living in an internet-accessible home while individuals convicted of offenses not relating to the internet (and with no history of misusing computers or the internet) may be allowed to reside in a home with internet access. (Dkt. 91 ¶¶ 14, 17.)

The plaintiffs see it the other way and contend that it fails to address the residency restrictions dealing with internet access. (Dkt. 107 ¶¶ 22–24.) Moreover, as a practical matter, the plaintiffs say the IDOC does not let any sex offender live in a host site with computers or other devices. (Dkt. 91 ¶¶ 14–17; Dkt. 107 ¶¶ 22–24.) To

illustrate, Daniel Barron's conviction for criminal sexual assault did not involve the use of a computer or the internet but he still may not access it. Dkt. 108 ¶¶ 148, 158; Dkt. 128 ¶ 158. By plaintiffs' count, Jason Tucker, Nicole Uhlir, Jennifer Tyree, Mike DiMichele, Bill Carney, and Robin Frazier's crimes all were unrelated to the internet, but notwithstanding that, the IDOC prohibits them from paroling to host sites with internet access. *Id.* ¶¶ 153–157, 159; Dkt. 128 ¶¶ 153–57, 159.

Upon sex offenders' initial release, the IDOC forbids all of them—whether convicted of crimes against adults or children—from living in a home where children also live or even visits "one time." (Dkt. 91 ¶¶ 18, 20.) Even so, a parent of a minor child may at some undefined later point request the ability to visit or live with the child. *Id.* ¶ 18. In other words, the IDOC will not release a married parent of a minor child to his or her own home to be with his or her spouse and child. *Id.* The only way that individual can get out of prison is if he or she can obtain a residence separate and apart from his or her family. *Id.*[1]

Parole agents have the additional discretion to deny approval of host sites for the presence of any of the following: a dog or other pets; alcohol; children's toys or clothes; devices that can access the internet like an iPad (perhaps on a case-by-case basis); pictures of children (even if those children are relatives of the individual on MSR or his or her own child); cameras, binoculars, telescopes, video equipment;

---

[1] This specific exercise of discretion is very troubling; however, the Court notes that Judge Feinerman is currently considering the constitutional propriety of this restriction in *Frazier et al. v. Baldwin*, No. 18-1991 (N.D. Ill. 2018). Because none of the plaintiffs in this case are parents or allege any deprivation of parental rights, the Court need not address the issue in any more detail.

gaming systems; and safes. *Id.* ¶ 21. If the host agrees to remove the problematic items, however, the agent can still approve the site. *Id.*

**Transitional and Interstate Housing**

There are no halfway houses or transitional housing facilities in Illinois that will accept an individual convicted of a sex offense. *Id.* ¶ 28; Dkt. 107 ¶ 25. Additionally, the IDOC does not permit any sex offender to use a homeless shelter as his or her host site. (Dkt. 91 ¶ 29.) This group of people is also ineligible for work release programs that the IDOC provides. *Id.* ¶ 30. It is possible for an offender to serve his or her MSR term outside of Illinois, however he or she must satisfy the criteria for transfers under the Interstate Compact for Adult Supervision. *Id.* ¶ 31; Dkt. 107 ¶ 9. These criteria include, in part, a requirement that the individual will either receive income or other financial support in the receiving state. (Dkt. 91 ¶ 31; Dkt. 107 ¶ 9–10.) The person can prove that they receive such support with evidence that he or she has a job, a letter from a family member or friend agreeing to cover him or her, evidence that he or she receives adequate government benefits, or possibly through other means. (Dkt. 91 ¶ 32; Dkt. 107 ¶ 9–10.)

Illinois also expects the receiving state to follow its parole conditions but does not require the receiving state to follow its statutes relating to sex offenders more generally. *Id.* ¶ 31. For instance, if the receiving state cannot comply with a certain parole condition, such as GPS monitoring, then that state must supervise the offender at the "next closest level of supervision, consistent with how the receiving state supervise[s] its own offenders for a similar offense." *Id.* The Illinois DOC will generally

not approve a transfer if a child or any one of the offender's previous victims (whether sex-related or not) reside at the proposed host site. (Dkt. 107 ¶ 12.)

An out-of-state host site must conform to all restrictions imposed by the receiving state. (Dkt. 91 ¶ 33.) The receiving state ultimately has the discretion to deny a discretionary transfer request based on several grounds, including that the parolee seeks transfer to a state where he or she does not have a "qualifying family member" (a parent, spouse, adult child, sibling, grandparent, aunt, or uncle). *Id.* ¶ 34. In total, 43 people are currently serving their MSR terms outside of Illinois. *Id.* ¶ 35. Only one of those people was a "discretionary transfer," meaning all others documented their financial and housing support of at least one family member in the receiving state. *Id.* ¶ 36.

## Class Members

### Paul Murphy

Paul Murphy is currently incarcerated at Taylorville Correctional Center even though a court only sentenced him to 36 months of probation on one count of aggravated possession of child pornography in 2012. *Id.* ¶ 39. About halfway into his sentence, the court revoked his probation because he was homeless and residing in the doorway of a building located within 150 feet of a park, in addition to the facts that: his specialized sex offender treatment program unsatisfactorily discharged him; he failed to appear for a scheduled field visit; and he provided false information to his probation officer regarding his employment status. *Id.* ¶ 40. In 2014, the court amended Murphy's sentence to include an MSR term of three years to life. *Id.* ¶ 41.

The PRB approved him for release in March 2014. *Id.* ¶ 42. The IDOC did not release him then because Murphy was unable to find a host site that the IDOC would approve. *Id.* ¶ 43.

Although Murphy has attempted to secure a compliant host site, Murphy remains incarcerated because he cannot do so. *Id.* ¶¶ 43–44. For example, Murphy applied to live in a halfway house in East St. Louis. *Id.* ¶ 45. This effort, amongst others, was unsuccessful because Murphy cannot live in homeless shelters, missions, or halfway houses seeing that none currently accept sex offenders. *Id.* ¶ 46. Murphy additionally applied to a work release facility that rejected him and a technology boot camp program that has not gotten back to him yet. *Id.* ¶ 47. Murphy cannot afford to purchase or lease any property of his own, and he does not have a spouse or any family who can support him. *Id.* ¶¶ 48–49. Murphy filed a grievance with the IDOC, but the Department denied it as well as his subsequent appeal, explaining that it "'does not make sex offender laws.'" *Id.* ¶ 50.

*Jasen Gustafsen*

Jasen Gustafsen is currently incarcerated at Lincoln Correctional Center. *Id.* ¶ 51. In 2013, a court sentenced him to a four-year term of imprisonment (at 50%) after he pleaded guilty to one count of aggravated possession of child pornography. *Id.* Accompanying Gustafsen's prison term was an MSR term of three years to life. *Id.* The PRB approved Gustafsen for release in October 2014. *Id.* ¶ 52. As soon as possible, Gustafsen began submitting host sites for approval, starting with his mother's residence, which the IDOC denied because of its proximity to a day care. *Id.*

¶ 53. The IDOC rejected Gustafsen's second bid for a host site because his aunt occasionally had her young grandchildren visit her home. *Id.* ¶ 54. Outside of his mother and aunt, Gustafsen has no family or friends who are willing and able to help him find hosing. *Id.* ¶ 56. For his part, Gustafsen has no resources to pay for his own housing. *Id.* ¶ 60. Gustafsen submitted a grievance to the PRB but never received a response. *Id.* ¶ 62.[2]

*J.D. Lindenmeier*

J.D. Lindenmeier is presently incarcerated at Taylorville Correctional Center. *Id.* ¶ 63. In 2006, a court sentenced him to six years' imprisonment (at 85%) after it convicted him of one count of predatory criminal assault of a child. *Id.* An MSR term of three years to life accompanied Lindenmeier's sentence. *Id.* The PRB approved Lindenmeier for release in July 2011. *Id.* Lindenmeier submitted the addresses of all his family members and friends, but the IDOC denied all of them. *Id.* ¶ 64. The Department denied Lindenmeier's father's residence because it was within 150 feet of a park with a playground area. *Id.* ¶ 65. It rejected Lindenmeier's mother's home due to the presence of computers, smartphones, and weapons in the home. *Id.* The IDOC denied his sister's home because she has two children living with her and it is within 500 feet of a daycare. *Id.* The Department rejected Lindenmeier's father's girlfriend's home because it was within 500 feet of a park with a playground area. *Id.* The IDOC denied another friend's residence as a host site because it was within 500 feet of a daycare. *Id.*

---

[2] The defendants indicated in their reply brief that the IDOC released Gustafsen to an approved host site in Urbana in February 2019. (Dkt. 127 at 24.)

Lindenmeier wrote numerous halfway houses and all of them rejected him. *Id.* ¶ 67. He also investigated the possibility of work release, but an IDOC counselor advised him that applying would be futile considering his sex offender status. *Id.* ¶ 68. On his own, Lindenmier has no money to look for or pay for housing. *Id.* ¶ 69. Beyond himself and the family and friends he tried to work with, Lindenmeier has no other family members or friends who can help him. *Id.* ¶ 70. Lindenmeier is unmarried, has no children, his family cannot afford to put him up somewhere, and they cannot move their home to assist him either. *Id.* Lindenmeier submitted a grievance but the IDOC officials at Taylorville responded that it was out of their purview. *Id.* ¶ 71. He resubmitted the grievance to Springfield, but those officials retorted that it was not a Parole Board issue. *Id.*

*Stanley Meyer*

Stanley Meyer is currently incarcerated at Taylorville Correctional Center. *Id.* ¶ 71. In 2008, a court convicted him of one count of criminal sexual assault and accordingly sentenced him to a 48-month term of imprisonment (at 85%) with an MSR term of three years to life. *Id.* ¶ 72. The PRB approved Meyer for release in July 2011. *Id.* ¶ 73. Meyer cannot support himself financially, and he has little to no contact with his family, who are unwilling or unable to help him. *Id.* ¶¶ 74–75. As his release date approached back in 2011, Meyer applied to numerous halfway houses, but they all rejected him. *Id.* ¶ 76. Meyer sought aid from other family and friends to no avail. *Id.* ¶ 77.

While incarcerated, Meyer has met with the PRB on several occasions. *Id.* ¶ 78. The meetings generally last two to three minutes because Meyer does not have any addresses he can submit for approval. *Id.* One official indicated multiple times that he would examine Meyer's situation, however the circumstances remain unchanged to date. *Id.* When Meyer's MSR term began, the head of counselors informed him that he would only remain incarcerated for two years after receiving the violation for lack of a suitable host site. *Id.* ¶ 79. Meyer is now in his seventh year of incarceration past his original release date in December 2011. *Id.* ¶ 80.

*Cinszeo Doss*

Cinszeo Doss is presently imprisoned at Graham Correctional Center. *Id.* ¶ 84. In 2009, a court sentenced him to 54 months (at 85%) after he pleaded guilty to one count of criminal sexual assault. *Id.* While serving his time, Doss learned that his sentence included an MSR term of three years to life. *Id.* Upon his release in 2012, Doss procured a residence with the help of his mother. *Id.* ¶ 85. Two years later, he had two jobs and multiple trade certificates from Kennedy King College. *Id.* A few years after his release, correctional staff informed him that his residence was no longer in compliance with the conditions of his MSR because another sex offender moved in nearby. *Id.* ¶ 86. The defendants contend that they gave Doss multiple extensions to find another host site during this time, and indeed, Doss's parole agent approved five different sites. *Id.*

Once reincarcerated, Doss submitted additional host sites that the IDOC ultimately denied. *Id.* ¶ 87. The Department denied several of them because they were

within 500 feet of one or more licensed day care centers, and another because it was just over 500 feet from an elementary school (and on a school route for children). *Id.* The agent was concerned about that specific address because Doss's offense was against a 13-year-old girl. *Id.* Later, the IDOC denied Doss's host sites because a day care center and play lot were within 500 feet of one, and there was a minor child living in the other (in addition to computers). *Id.* ¶ 88. The IDOC denied another host site after Doss's parole agent spoke with the landlord, after which the landlord stated that Doss's mother lied to her about Doss's status, instead telling her Doss was not a sex offender. *Id.* ¶ 89. She then concluded that she did not want any felons on her property and the placement fell through. *Id.* Doss's family has made multiple trips to a parole office to advocate for him, and the plaintiffs allege that Doss's family is consistently met with aggression. *Id.* ¶ 90.[3]

*Charles Dobson*

Charles Dobson is currently incarcerated at Taylorville Correctional Center. *Id.* ¶ 91. In 2008, a court sentenced him to ten years' imprisonment (at 85%) after convicting him of aggravated criminal sexual abuse and predatory criminal sexual assault. *Id.* Dobson's MSR term is now three years to life, though it was not always so. *Id.* Dobson has no financial resources of his own that he can use to pay for housing. *Id.* ¶ 92. He has tried to find an appropriate host site but has not had any luck. *Id.* ¶ 93. The IDOC rejected his father's home because it is directly adjacent to a wooded park operated by the local park district, not to mention the fact that the

---

[3] The defendants noted in their reply brief that the IDOC released Doss in February 2019. (Dkt. 127 at 24.)

village refused to register Dobson at that address. *Id.* The parole agent was ready to approve the address upon receipt of a letter from the police department permitting Dobson to live there. *Id.* But, even after the agent followed up a second time, the department never provided the letter. *Id.* The IDOC denied another host site because it was 121 feet from a park that includes a playground. *Id.* ¶ 94.

In considering an additional placement, the Department rejected it because another sex offender lived in the building next to it and the same person owned both buildings. *Id.* The IDOC, for its part, interprets the statutory restriction on residing in the same "condominium complex or apartment complex" as another sex offender to mean that only one sex offender may live amongst adjoining properties owned by the same person or business. *Id.* Dobson also reached out to multiple transitional housing organizations but heard back that they cannot help sex offenders in Illinois. *Id.* ¶ 95.

*Alfred Aukema*

Alfred Aukema is presently imprisoned at Taylorville Correctional Center. *Id.* ¶ 97. In 2012, a court sentenced him to a five-year term of imprisonment (at 85%) after convicting him of criminal sexual assault with the use of force. *Id.* Aukema additionally received an MSR term of three years to life. *Id.* Since September 2017, Aukema has been eligible for release. *Id.* Aukema has no spouse and no money to his name. *Id.* ¶ 98. Aukema made three attempts to obtain a proper host site; all three failed. *Id.* ¶ 99. The IDOC denied the first address because the first owner is currently incarcerated at Taylorville. *Id.* It denied the second address, in a trailer

park, because another sex offender lived in a different unit on the other side of the park. *Id.*

Using its restrictions, the California Department of Corrections denied the third address because his aunt's grandchildren visited her there and firearms were on the property. *Id.* Aukema has been otherwise unsuccessful in his search, due in part to the fact that halfway houses, religious organizations, and other third-party entities will not assist an offender with a three-to-life MSR term in Illinois. *Id.* ¶ 100. Aukema has no other host sites to propose. *Id.* ¶ 101. With that in mind, Aukema would like the Department to release him into homelessness so he can get a job while living in a shelter and save up the money for his own place. *Id.* Short of that, Aukemea is "'afraid that the only way [he] will ever get out of [t]here is if [he] die[s].'" *Id.* ¶ 102.

*Jonathan Sparks*

Jonathan Sparks is currently incarcerated at Big Muddy River Correctional Center. *Id.* ¶ 103. A court convicted him of criminal sexual assault and sentenced him to four years imprisonment with an MSR term of three years to life in 2010. *Id.* Sparks became eligible to serve his MSR term in July 2013. *Id.* ¶ 104. Because Sparks is single and has no real assets, he has no way of paying for housing. *Id.* ¶ 105. He additionally has no family or friends in Illinois to help him. *Id.* ¶ 106. For that reason, Sparks has tried to utilize the Interstate Compact, but authorities have denied each of his proposed host sites. *Id.*

For instance, the Colorado Department of Corrections denied his father's home because of "unsafe living conditions," neglecting to explain that conclusion any further. *Id.* The Nebraska Department of Corrections denied his mother's home because Sparks' uncle, another sex offender, lives there. *Id.* Finally, the California Department of Corrections rejected his uncle's home because it was about 400 feet away from a school. *Id.* Sparks also contacted a mission for assistance, but it refused to aid. *Id.* ¶ 107. When the Illinois Department of Corrections attempted to place him at a different ministry, Sparks turned the Department down. *Id.* With nobody else to turn to, Sparks fears he will be trapped in prison for the rest of his life. *Id.* ¶ 108.

*Christopher Korszlak*

Christopher Korszlak is presently imprisoned at Robinson Correctional Center. *Id.* ¶ 109. In 2014, a court convicted him of possession of child pornography (class 2) and accordingly sentenced him to six years (at 50%) in prison. *Id.* Korszlak's sentenced includes an MSR term of three years to life, which he has been eligible to serve since October 2015. *Id.* Korszlak is divorced and has no assets or savings. *Id.* ¶ 110. Korszlak, for his part, has proposed one host site, which the IDOC denied due to "unsafe conditions." *Id.* ¶ 111. Korszlak believes the denial was due to the presence of another sex offender in another room of the hotel. *Id.*

During his incarceration, Korszlak has reached out to every transitional housing facility or rehabilitation organization he can find in Illinois, which totals 95. *Id.* ¶ 112. All these institutions either ignored Korszlak or declined his requests because of his sex offender status. *Id.* Korszlak went even further, submitting an

International Prisoner Transfer Request, applying for asylum, and trying to renounce his American citizenship. *Id.* ¶ 113. All relevant decisionmakers rejected his advances. *Id.*

*Kevin Rogers*

Kevin Rogers is currently incarcerated at Robinson Correctional Center. *Id.* ¶ 115. A court convicted him of criminal sexual assault and therefore sentenced him to ten years' imprisonment (at 85%) in 2008. *Id.* Rogers has been eligible to serve his MSR term on the outside since February 2018. *Id.* Rogers is single and has no savings or substantial assets. *Id.* ¶ 116. Rogers has attempted to secure a compliant host site but has not been successful. *Id.* ¶ 117. The IDOC denied his mother's home because it was 325 feet from a park. *Id.* It rejected another address because Rogers' victim—the host's daughter—frequents the home, in addition to the following facts: the host refused to allow the agent to enter the home, there was no landline phone, and the host site was a health hazard. *Id.*

The Department denied Rogers' girlfriend's home because there were children's toys there and the agent advised the host that the home could be approved after the host removed them. *Id.* The IDOC denied Rogers' friend's home because there were firearms in the house that the host was unwilling to remove, the host's five-month-old granddaughter frequently visited the home, the host had a smart phone, and Rogers failed to divulge to the host that he was a sex offender. *Id.* Finally, the Missouri Department of Corrections rejected his discretionary transfer. *Id.* Rogers' counselor informed him that there are no halfway houses in Illinois that accept

sex offenders on MSR. *Id.* ¶ 118. Still, Rogers has reached out to many organizations but has never received a response. *Id.* Different treatment centers denied him, too. *Id.* Rogers has no friends that can help through this process. *Id.* ¶ 119.

*John Michael Cichon*

John Michael Cichon is presently imprisoned at Graham Correctional Center. *Id.* ¶ 120. In 2011, a court convicted him of child pornography and sentenced him to 180 days' incarceration and two years of probation. *Id.* A court revoked that sentence in 2012 and sentenced him to four years in the IDOC with a two-year MSR term. *Id.* That MSR term later changed to three years to life, which Cichon has been eligible to serve since November 2013. *Id.* Cichon has little to no savings and income. *Id.* ¶ 121. He has not submitted potential addresses for host sites because he is certain that the Department will deny all of them due to the presence of children or internet access. *Id.* ¶ 122. Cichon attempted to secure apartment leases on his own, but an IDOC agent informed him that he is not able to enter into leases or contracts on his own behalf during his incarceration. *Id.* ¶ 123. In other words, someone else must lease the apartment or home for him. *Id.* Of the several halfway houses he and his family contacted, none are open to sex offenders. *Id.* ¶ 124.

*Antoine Darnell Lamb*

Antoine Darnell Lamb is currently incarcerated at Taylorville Correctional Center. *Id.* ¶ 125. A court convicted him of criminal sexual assault with the use of force in 2010 and then sentenced him to seven years' imprisonment with an MSR term of three years to life. *Id.* Lamb became eligible for MSR in April 2015. *Id.*

Lamb has no assets or money to his name. *Id.* ¶ 126. Lamb tried to submit a handful of addresses, but the IDOC denied all of them. *Id.* ¶ 127. The Department rejected the first because of two day care centers and a park within 500 feet of the address; the second because there was another registered child sex offender living there; the third because there was a licensed day care center within 500 feet of the proposed site; the fourth the Iowa Department of Corrections denied because it violated Iowa's 2,000-foot restriction; and the fifth the Illinois DOC rejected because its owner is a child sex offender and it was also within 500 feet of a licensed day care center. *Id.* Lamb has no family or friends that can help him. *Id.* Lamb has been unable to find any halfway houses, religious organizations, or support groups to house him. *Id.* ¶ 128.

*Nicole Juanita Uhlir*

Nicole Juanita Uhlir is presently imprisoned at Logan Correctional Center. *Id.* ¶ 129. In 2006, a court convicted her of predatory criminal sexual assault and sentenced her to six years' (at 85%) incarceration with a three-to-life MSR term. *Id.* Although Uhlir has served MSR terms twice, she has violated the rules both times. *Id.* Uhlir is single and has little to no income, leaving her with no way to pay for her own housing. *Id.* ¶ 130. Uhlir was initially residing with a friend while on MSR, but the IDOC now deems that address unsuitable for her. *Id.* ¶ 131. Her parole agent has never explained to Uhlir why the home is noncompliant. *Id.* According to the Department, Uhlir's friend allowed her to violate the rules by making prohibited items, including a smartphone, available to her. *Id.* The IDOC denied the other

address Uhlir submitted because there is a soccer field within 195 feet of the site. *Id.* ¶ 132. Uhlir has no family or friends to turn to and stated that she felt indefinitely trapped. *Id.* ¶ 133. The IDOC released Uhlir in December 2018 and has required her to wear a GPS ankle monitor in addition to the "beacon" device in her home. (Dkt. 108 ¶ 143.)

**GPS Monitoring**

Wisconsin, unlike Illinois, provides parole agents with directions about how to supervise and manage homeless sex offenders. *Id.* ¶136. The Wisconsin DOC subjects homeless parolees to special restrictions, including GPS monitoring. *Id.* ¶ 137. Under that restriction, the individuals on release must "'remain in the county of supervision, unless an exception is granted for employment, offense related programming, or other pre-approved activities.'" *Id.* They also "'must call and speak with the [parole] agent at least once every seven days, on a weekday, to report . . . the location(s) in the city where he/she has been frequenting and sleeping for the past seven days and plans to frequent/or sleep for the next seven days.'" *Id.*

The Illinois DOC, for its part, has been using GPS to monitor people on MSR for more than ten years. *Id.* ¶ 138. The system tracks offenders' whereabouts, their movement, how long they remain in any location, and the precise time of their movement. *Id.* ¶ 139. It additionally sends parole agents an immediate alert when a parolee enters an exclusion zone—somewhere the agent does not permit the person to be—or an inclusion zone, wherever the agent specifies that the offender should be at a specific time, like a job or appointment. *Id.* The agent can use a computer to see

where the offender is at any given time and review stored location data. *Id.* The parties dispute whether GPS and electronic monitoring are duplicative of each other and truly necessary (for example, to monitor a parolee when he or she is home). (Dkt. 107 ¶ 19.) The parties further dispute whether a well-used GPS monitoring system is enough standing alone to monitor homeless sex offenders, or whether additional parole agents and resources are necessary. *Id.* ¶ 21.

The defendants' representative testified that using this GPS system to track sex offenders is "'not a good fit.'" (Dkt. 88 ¶ 140.) He also stated that using GPS to monitor these individuals would be a "'huge public safety risk'" because the offender would not have a defined place to be or a purpose for his or her actions, defeating the purpose of MSR. *Id.* The witness asserted being homeless would place a sex offender at greater risk of being blamed for other crimes. *Id.* That said, the IDOC releases other convicted felons (including murderers and violent criminals) into homelessness to serve their MSR terms so long as they do not have electronic monitoring as a condition of that term. *Id.* ¶ 141; Dkt. 107 ¶ 18. The witness did not identify any problems supervising those parolees. Dkt. 107 ¶ 18.

There are examples in the record of the IDOC's use of GPS to monitor sex offenders. For instance, a court convicted Jason Tucker of predatory criminal sexual assault in 2011 and sentenced him to seven years in prison (at 85%), plus an MSR term of three years to life. (Dkt. 128 ¶ 143.) Since moving from prison to MSR in 2017, the IDOC has always required Tucker to wear a GPS ankle monitor. *Id.* Taking another example, Nicole Uhlir is currently on MSR for predatory criminal sexual

assault of a child, and she wears a GPS ankle monitor on top of the "beacon" device in her home. *Id.* ¶ 144.

Further illustrations abound, including Jennifer Tyree, Michael DiMichele, Bill Carney, and Robin Frazier, all sex offenders who the IDOC requires to wear GPS monitors. *Id.* ¶¶ 145–47, 149. Many also have beacon monitors in their homes. *Id.* ¶¶ 145–47. The technology allows parole agents to keep an eye on the individuals, which one time prompted Tyree's agent to ask her why she stopped at a Steak and Shake on her way home from work. *Id.* ¶ 145. DiMichele's ankle monitor tells him whenever he enters a prohibited location or violates his approved movement. *Id.* ¶ 146.

According to the defendants, the goals of sex offender supervision, include "'risk management,' 'prevent[ing] future victimization,' and reduc[ing] recidivism,' as well as 'providing effective treatment for sex offenders' and 'provid[ing] opportunities for successful reintegration of the individual into the community and family.'" Dkt. 88 ¶ 142. The average cost to the State of supervising a parolee on release in the community is approximately $2,000/year, compared to $26,365/year to incarcerate a person. *Id.* ¶¶ 134–35.

## STANDARD OF REVIEW

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see, e.g.*, *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 485 (7th Cir. 2019). The parties genuinely dispute a material fact when "'the evidence

is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609–10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Zander v. Orlich*, 907 F.3d 956, 959 (7th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In reviewing cross-motions for summary judgment, the Court "'construe[s] all inferences in favor of the party against whom the motion under consideration is made.'" *Med. Protective Co. of Fort Wayne, Indiana v. Am. Int'l Specialty Lines Ins. Co.*, 911 F.3d 438, 445 (7th Cir. 2018), *reh'g denied* (Jan. 29, 2019) (quoting *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018)).

## ANALYSIS

The plaintiff class members moved for summary judgment on four grounds, arguing that the challenged scheme violates: (1) substantive due process (Count I); (2) equal protection (Count II); (3) procedural due process (Count III); and (4) the Eighth Amendment (Count IV). Before diving into the merits of these constitutional claims, the parties briefed two preliminary issues that must be addressed: first, whether a petition for a writ of habeas corpus or an independent civil rights suit under 42 U.S.C. § 1983 is the proper vehicle; and second, whether the Court should apply strict scrutiny or rational basis review in its evaluation of the claims.

## I.     § 1983 vs. § 2254

Starting with the vehicle question, the defendants argue that the plaintiffs must raise their constitutional claims in individual habeas corpus petitions. The defendants contended as much when they moved to dismiss, and the Court denied their motion on this ground. (Dkt. 31 at 10–13.) In so ruling, the Court reasoned that "Plaintiffs do not claim 'entitlement' to parole or MSR. Plaintiffs claim entitlement to a constitutional process in determining whether they will be released on MSR, not to release on MSR . . . Plaintiffs do not claim a right to release but instead that officials are using unconstitutional rules." *Id.* at 13. The defendants invited reconsideration of this ruling on their motion for summary judgment; the Court again rejects their advance.

As understood earlier, the plaintiffs' case is about fair procedure and not release from incarceration, although as a remedial matter they might end up there. "[W]hen a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in [his] favor . . . would necessarily imply the invalidity of his conviction or sentence." *Heck v. Humphrey*, 512 U.S. 477, 487 (1994); *see Morgan v. Schott*, 914 F.3d 1115, 1117, 1121 (7th Cir. 2019). Here, the plaintiffs are neither challenging their sex-crimes convictions nor their sentences, which include their MSR terms of three years to life. Put a little differently, the plaintiffs do not seek to invalidate the fact or duration of their confinement. Rather, they seek to change the processes used in determining the penultimate condition of their confinement—location.

In *Wilkinson v. Dotson*, the Supreme Court held that a civil rights plaintiff may seek a constitutional change in the parole procedures used to adjudicate his confinement status. 544 U.S. 74, 82 (2005). The Court reasoned that, because neither prisoner sought an injunction ordering his immediate or speedier release into the community, a remedy in their favor would mean *at most* new eligibility for review. *Id.* That might have sped up the consideration of their release, but it did not automatically follow that that the inmates would in fact be released. *Id.* The Court analyzed *Heck*'s use of the word "sentence" to mean not prison procedures, but "substantive determinations as to the length of confinement." *Id.* at 83. That led to the conclusion that prisoners may bring § 1983 challenges to prison administrative decisions. *Id.* at 84.

The Seventh Circuit has followed suit. *See Henderson v. Bryant*, 606 F. App'x 301, 304 (7th Cir. 2015); *Burd v. Sessler*, 702 F.3d 429, 433 (7th Cir. 2012); *Adams v. Bledsoe*, 173 F. App'x 483, 484 (7th Cir. 2006); *Bunn v. Conley*, 309 F.3d 1002, 1007–08 (7th Cir. 2002); *Isby v. Newkirk*, 105 F.3d 660, at *1 (7th Cir. 1996) (nonprecedential disposition); *Falcon v. U.S. Bureau of Prisons*, 52 F.3d 137, 138–39 (7th Cir. 1995). It is the defendants' position that the plaintiffs are challenging a condition of their confinement because they are "seeking a different program or location or environment," turning the question into whether what they ask for amounts to a "quantum change in the level of custody." *Graham v. Broglin*, 922 F.2d 379, 381 (7th Cir. 1991). Beginning in *Graham*, the Court of Appeals recognized that "[t]he difficult intermediate case is where the prisoner is seeking not earlier freedom, but transfer from a

more to a less restrictive form of custody." *Id.* The critical distinction from that work-release case to this one is that here, unlike there, the plaintiffs are not claiming entitlement to release. *See id.*

Instead, the plaintiffs in this case dispute the procedures used in host site review. As in *Richmond v. Scibana*, the wrong perspective to take is "to . . . question whether differences between . . . prison . . . and community confinement are sufficiently great that [the plaintiffs] can be deemed to challenge the fact of custody, rather than simply conditions of confinement acknowledged to be lawful." 387 F.3d 602, 605 (7th Cir. 2004) (citations omitted). A favorable result for the plaintiffs in this litigation would not entitle them:

> to any change in the duration or even the location of [their] confinement. A judge could do no more than determine the extent of the [Department's] discretion to make placement decisions; the substance of any eventual decision is not at issue. Parole litigation supplies a helpful analogy: a prisoner claiming a right to release on parole must use § 2241 (or § 2254 for a state prisoner); but a prisoner claiming that parole officials are apt to use incorrect rules when resolving a future application must use the APA (or 42 U.S.C. § 1983 for a state prisoner).

*Id.* (citing *White v. Henman*, 977 F.2d 292 (7th Cir. 1992); *Clark v. Thompson*, 960 F.2d 663 (7th Cir. 1992); *Walker v. Prisoner Review Board*, 694 F.2d 499 (7th Cir. 1982)).

The statutory scheme here "in no way affects the duration, much less the fact, of confinement. [Their] supervised release will still be in place, and it will last just as long." *Bunn*, 309 F.3d at 1008. Accordingly, a straightforward application of *Richmond* carries the day. "[A] challenge to rules that affect placement in community confinement [shall be treated] the same way as rules that affect placement in parole

systems." *Richmond*, 387 F.3d at 606. The defendants were wrong to frame the question as prison versus supervised release, but even if they were right, the plaintiffs' claims nonetheless land in § 1983's net. *See Moran v. Sondalle*, 218 F.3d 647, 650, 652 (7th Cir. 2000) (explaining that prisoners who do not demand early release and alternatively contest the procedures used to make those determinations must use § 1983 as their vehicle of choice). The plaintiffs have been consistent since day one in not directly requesting release but asking for a constitutional application of the relevant law and policy to their situations. (Dkt. 1 at 27–29, 33–34.) Thus, the plaintiffs properly brought their claims under § 1983.

## II. Scrutiny

The parties next disagree on which level of judicial scrutiny governs the plaintiffs' constitutional claims. On the one hand, the defendants argue that the Court should apply *Turner v. Safley*, which holds that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. 78, 89 (1987). On the other hand, the plaintiffs contend that *Johnson v. California* controls, which refused to extend *Turner* to a racial segregation policy in the prison context because strict scrutiny applies to all racial classifications. 543 U.S. 499, 515 (2005). Because the plaintiffs here are in effect asserting their rights as releasees and not prisoners, the question becomes whether *Turner* extends from prison administration to the supervised release apparatus.

Although circuit precedent is scant, the Court of Appeals has touched on the issue in two separate decisions. First, in *Felce v. Fiedler*, the court considered a Wisconsin inmate's procedural due process challenge to the parole committee's decision to condition his release on the receipt of antipsychotic drug injections. *See* 974 F.2d 1484, 1486–88 (7th Cir. 1992). Recognizing that it was analyzing a parole situation and not a prison situation, the court did not doubt that *Turner*'s standard applied. *See id.* at 1494. To be sure, *Turner* was a substantive due process case, however that did not affect the *Felce* court's evaluation of the procedural due process claim alleged by the prisoner there. Second, in *Williams v. Wisconsin*, the court in passing hinted that *Turner*'s recognition of prisoners' fundamental right to marry would necessarily extend to parolees and thus the state may only limit it for sound penological reasons. *See* 336 F.3d 576, 582 (7th Cir. 2003). It just so happens that, in *Williams*, no one had forbidden the parolee from marrying; instead, the state had affected the timing and location of his plans. *See id.* So, although *Turner* was relevant, it was not dispositive.

This seeming extension of *Turner* from prison to parole makes sense in view of the Supreme Court's admonition that the *Turner* test applies whenever constitutional rights and prison administration butt up against one another. In *Washington v. Harper*, the Court explained that:

> These two principles *apply in all cases* in which a prisoner asserts that a prison regulation violates the Constitution, not just those in which the prisoner invokes the First Amendment. We made quite clear that the standard of review we adopted in *Turner applies to all circumstances* in which the needs of prison administration implicate constitutional rights.

494 U.S. 210, 224 (1990) (citations omitted) (emphasis added); *see Russell v. Richards*, 384 F.3d 444, 447 (7th Cir. 2004).

*Johnson v. California*, then, does not get the plaintiffs home. In that case, the Supreme Court declined to expand *Turner* to cover racial classifications, reasoning that it applies the reasonable-relationship test "*only* to rights that are 'inconsistent with proper incarceration.'" 543 U.S. 499, 510 (2005) (emphasis in original) (quoting *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003); then citing *Pell v. Procunier*, 417 U.S. 817, 822 (1974) ("[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system")). The Court clarified that "certain privileges and rights must necessarily be limited in the prison context." *Id.* (citations omitted). That is why *Turner* does so much work in First Amendment cases, and relevant here, with some due process claims. *See id.* Racial discrimination is of an entirely different mold because eradicating it is consistent with appropriate prison management and therefore need not be undermined in that context.

In this case, however, the liberty interests that the plaintiffs allege the defendants are depriving them of are "susceptible to the logic of *Turner* . . . because [they are] . . . right[s] that need necessarily be compromised for the sake of proper prison administration." *Id.* at 510. The whole point of the varying forms of custody at issue in these cases—incarceration, parole, probation, supervised release—is to restrict the liberty of individuals convicted of crimes. Custody determinations, to the extent they fall within the ambit of the Fourteenth Amendment, come under the scope of *Turner*

because they lie at the core of running a correctional system. *Cf. Jones v. Walker*, 358 F. App'x 708, 711 (7th Cir. 2009) (choosing not to use *Johnson* for allegations of racial segregation that result from facially neutral prison safety policies); *McClain v. Rogers*, 155 F. App'x 918, 920 (7th Cir. 2005) (same).

That said, the Court was explicit in *Johnson* that it has "not used *Turner* to evaluate Eighth Amendment claims of cruel and unusual punishment in prison. We judge violations of that Amendment under the 'deliberate indifference' standard, rather than *Turner*'s "reasonably related" standard." 543 U.S. at 511 (citing *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) (quoting source omitted)). The Court stated this was "because the integrity of the criminal justice system depends on full compliance with the Eighth Amendment." *Id.* (citing *Spain v. Procunier*, 600 F.2d 189, 193–94 (9th Cir. 1979) (Kennedy, J.)); *see Norwood v. Vance*, 591 F.3d 1062, 1074 (9th Cir. 2010).

Implementing these rules here streamlines the foregoing discussion of standard of review: The Court will use *Turner* to assess the plaintiffs' procedural due process (e.g. *Felce*) and equal protection claims but not their Eighth Amendment claim. With respect to the class members' substantive due process claim, however, the Court concludes that it is duplicative of the Eighth Amendment claim. Both constitutional provisions regulate the government's authority to confine a person, they just come into play at different times. For instance, the Fourteenth Amendment covers pretrial detainees, while the Eighth Amendment houses posttrial convicts. *See Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2475 (2015) (citations omitted).

Although it is uncertain "which amendment controls for hybrid forms of detention, . . . the Eighth Amendment standard . . . is at least as difficult for a plaintiff to satisfy as the Fourteenth Amendment standard." *Estate of Clark v. Walker*, 865 F.3d 544, 546 n.1 (7th Cir. 2017), *cert. denied*, 138 S. Ct. 1285 (2018) (concerning extended supervision in Wisconsin) (citing *Cavalieri v. Shepard*, 321 F.3d 616, 620 (7th Cir. 2003) ("as a pretrial detainee, [plaintiff] was entitled to at least the same protection against deliberate indifference to his basic needs as is available to convicted prisoners under the Eighth Amendment ") (additional source omitted)); *see, e.g.*, *Miller v. City of Columbus*, No. 2:05-CV-425, 2007 WL 915180, at *10 (S.D. Ohio Mar. 26, 2007) (collecting cases that used the Fourth Amendment's objective reasonableness standard to evaluate parolee/releasee's excessive force claims).

Both the Eighth Amendment and Fourteenth Amendment claims get at the same issue: whether the state unconstitutionally deprived the plaintiffs of their liberty by keeping them in prison, instead of supervising them on release, because they are indigent and homeless. This is a total conceptual overlap, and one the Seventh Circuit appears to treat as governed by the Eighth Amendment. *See Courtney v. Butler*, No. 17-3310, 2019 WL 718888, at *1 (7th Cir. Feb. 13, 2019); *Willis v. Ross*, 745 F. App'x 629, 631 (7th Cir. 2018); *Turner v. Godinez*, 693 F. App'x 449, 454 (7th Cir. 2017); *Aguilar v. Gaston-Camara*, 861 F.3d 626, 631–33 (7th Cir. 2017); *Werner v. Wall*, 836 F.3d 751, 760–61 & n.25 (7th Cir. 2016) (reviewing the case law); *Figgs v. Dawson*, 829 F.3d 895, 906 (7th Cir. 2016); *Perrault v. Wisconsin Dep't of Corr.*, 669 F. App'x 302, 303 (7th Cir. 2016); *Childress v. Walker*, 787 F.3d 433, 438 (7th Cir.

2015); *Armato v. Grounds*, 766 F.3d 713, 721 (7th Cir. 2014); *Jones v. Skalski*, 494 F. App'x 667, 670 (7th Cir. 2012); *Schneider v. Cty. of Will*, 366 F. App'x 683, 685 (7th Cir. 2010); *Burke v. Johnston*, 452 F.3d 665, 669 (7th Cir. 2006); *Campbell v. Peters*, 256 F.3d 695, 700 (7th Cir. 2001).

Keeping that in mind, the Court heeds the Justices' admonition that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see Graham*, 490 U.S. at 395 n.10 ("After conviction, the Eighth Amendment 'serves as the primary source of substantive protection . . . Any protection that 'substantive due process' affords convicted prisoners against excessive force is, we have held, at best redundant of that provided by the Eighth Amendment.") (citing *Whitley v. Albers*, 475 U.S. 312, 327 (1986)); *see also Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998). Because of this analytical redundancy, the Court will proceed under the Eighth Amendment and not the Fourteenth.

## II.    Equal Protection (Count II)

The Equal Protection Clause of the Fourteenth Amendment prohibits the government from treating similarly situated persons differently. "Prisoners do not surrender their rights to equal protection at the prison gate. Unequal treatment among inmates, however, is justified if it bears a rational relation to legitimate penal interest." *Williams v. Lane*, 851 F.2d 867, 881 (7th Cir. 1988) (citing *Hudson v. Palmer*,

468 U.S. 517, 522–23 (1984)); *see Kramer v. Pollard*, 497 F. App'x 639, 642–43 (7th Cir. 2012); *Stojanovic v. Humphreys*, 309 F. App'x 48, 52 (7th Cir. 2009) ("Prisoners retain their right to equal protection"); *Aruanno v. Corzine*, 687 F. App'x 226, 230 (3d Cir. 2017), *cert. dismissed sub nom. Aruanno v. Christie*, 138 S. Ct. 235 (2017); *Harrington v. Scribner*, 785 F.3d 1299, 1308 (9th Cir. 2015) (noting penological interests still factor into the analysis of an equal protection claim).

The Seventh Circuit has consistently applied the Equal Protection Clause to varying custodial levels in the correctional context. *See, e.g., Taylor v. Edgar*, 52 F. App'x 825, 826–27 (7th Cir. 2002); *May v. Sheahan*, 226 F.3d 876, 882–83 (7th Cir. 2000); *Beatty v. DeBruyn*, 77 F.3d 484 (7th Cir. 1996); *Hatch v. Sharp*, 919 F.2d 1266, 1268–69 (7th Cir. 1990); *Doyle v. Elsea*, 658 F.2d 512, 517–19 (7th Cir. 1981); *Faye v. Gray*, 541 F.2d 665, 667–68 (7th Cir. 1976). While a prisoner's indigence does not generally call for equal protection analysis, the Supreme Court has at least twice invalidated facially neutral criminal laws that authorized the detention of poor individuals because of their indigence. *See Tate v. Short*, 401 U.S. 395, 397–99 (1971); *Williams v. Illinois*, 399 U.S. 235, 241–42 (1970); *see also ODonnell v. Harris Cty.*, 892 F.3d 147, 161–62 (5th Cir. 2018); *Walker v. City of Calhoun, GA*, 901 F.3d 1245, 1259–60 (11th Cir. 2018) (analyzing equal protection claim of pretrial indigent detainees).

The plaintiffs argue that the defendants are denying them equal protection of the law because, but for their indigency, the plaintiffs would be able to pay for their own housing and serve their MSR terms in the community. In other words, the

statutory and regulatory scheme as-applied to sex offenders with three-to-life MSR terms treats those who are wealthy different from those who are poor. The defendants contend that they are not requiring the plaintiffs to pay for anything (like a fine) to secure their release. Ultimately, assert the defendants, the IDOC's requirement that sex offenders have a stable host site is rationally related to protecting the public, especially children.

Contrary to the defendants' statements, the proper way to frame the question is as follows: whether indigent sex-offense releasees in Illinois remain incarcerated when similarly situated wealthy sex-offense releasees are not solely because the indigent releasees cannot afford to pay for housing outside of prison. *See State v. Adams*, 91 So. 3d 724, 741–42 (Ala. Crim. App. 2010) (scrutinizing homeless and indigent offenders' as-applied challenge to entire statutory scheme that required an adult criminal sex offender to provide the state DOC with the address where he will reside upon release at least 45 days prior to the offender's release from custody); *see generally, e.g.*, *McGinnis v. Royster*, 410 U.S. 263 (1973) (considering as-applied challenge to entire statutory scheme and focusing on those prisoners unable to afford bail). The state's treatment of the indigent and the non-indigent must be *categorically* different, and indeed, worse. *See Walker*, 901 F.3d at 12560.

Here, those sex offenders who are indigent and homeless continue to be incarcerated upon completion of their court-ordered terms of imprisonment, while those sex offenders who are neither indigent nor homeless are released into the community. This application of the statutory scheme discriminates against the plaintiffs because

of their poverty. The undisputed record demonstrates that the class members are adult criminal sex offenders who have completed their terms of imprisonment and attempted to comply with the requirements imposed upon them in securing a host site. Because they are indigent and homeless, however, the plaintiffs have been— and still are—incapable of doing so. The fact that the defendants are not requiring the plaintiffs to pay them via a fine, but rather a third-party (potentially a landlord), is entirely beside the point because the defendants still require the defendants to have money and financial support to get out of prison.

By way of example, J.D. Lindenmeier completed the term of incarceration that the trial court ordered him to serve for the commission of his original sex crime (one count of predatory criminal assault of a child) in 2011, which is when the PRB approved him for release. (Dkt. 91 ¶ 63.) His continued imprisonment is not the result of the underlying offense but is instead the consequence of his indigency, homelessness, and the attendant powerlessness to procure housing that will satisfy the IDOC. *Id.* ¶¶ 69–70. Lindenmeier's incarceration, then, is for reasons completely beyond his control. Looking at another instance, Stanley Meyer completed his term of imprisonment for his original sex crime (one count of criminal sexual assault) in 2011, when the PRB approved him for release. *Id.* ¶¶ 71–73. He, too, remains incarcerated—not as a consequence of the underlying offense but because he is indigent and homeless, leaving him unable to identify a host site. *Id.* ¶¶ 74–75.

On its face, the statutes and regulations equally apply to all convicted sex offenders by mandating a stable host site that satisfies all associated requirements.

The scheme does not facially classify offenders, and upon completion of the court-ordered term of imprisonment, all sex offenders can theoretically regain their liberty by providing an address that meets all obligations. As applied, however, the opportunity for an indigent and homeless sex offender to procure release from confinement following completion of incarceration is virtually nonexistent. As the undisputed and material evidence demonstrates, only those sex offenders with access to funds to pay for their own accommodations at an approved location will be free from incarceration.

Indigents without the resources to pay for lodging will remain in prison indefinitely. *Id.* ¶ 38 ("'Q: Is it possible for a sex offender with an indeterminate MSR term who, A, does not have money to pay for his own housing, and, B, does not have family or friends on the outside who can pay for his housing [whether by living with them or paying for separate accommodations] to ever get out of the Illinois Department of Corrections? A: Never say never, but, . . . using those criteria, no.'"). This confinement is potentially endless for the indigent and homeless sex offender solely because he or she has no money to secure a place to stay when imprisonment ends and mandatory supervised release (supposedly) begins.

The defendants have created separate consequences for indigent, homeless sex offenders and for non-indigent, non-homeless sex offenders. Only those who have no financial resources suffer a continued deprivation of liberty following the completion of their court-ordered term of incarceration for the original sex offense. The defendants are punishing the plaintiffs for their indigency and homelessness, matters totally beyond their control. The defendants are therefore wrong to argue that the

IDOC's requirement that sex offenders have a stable host site (applied collectively through statute, regulation, and policy) is rationally related to protecting the public, especially children. The right pivot point in the equal protection context is whether the government's separate and discriminatory treatment of similarly situated individuals rationally relates to a legitimate penological interest.

In this case, the defendants' application of the laws to keep indigent and homeless sex offenders locked up (while non-indigent sex offenders roam free) has no reasonable relation to public protection. Quite the contrary, "the condition at issue here—indigency—is itself no threat to the safety or welfare of society." *Bearden v. Georgia*, 461 U.S. 660, 669 n. 9 (1983). There is no meaningful penological distinction between indigent and non-indigent sex offenders: the state's public safety objective is constant. A homeless and indigent sex offender is presumably as dangerous to the community as one who is capable of paying for his own lodging. That wraps up the first *Turner* factor, and turning to the others, they also weigh in favor of invalidation of this practice. *See Stojanovic*, 309 F. App'x at 51.

There are not alternative means of exercising the right (here, liberty) notwithstanding the policy—the defendants' present application of the rules and regulations deprives sex offenders of their conditional liberty on mandatory supervised release. Perhaps the defendants could relax some MSR requirements that do not implicate wealth, but that is hard to imagine on the record as it stands now. Even assuming that factor tilted toward the defendants, the other two do not. The impact that accommodating the right will have on prison resources is actually a positive one. (Dkt.

88 ¶¶ 134–35 (agreeing that the average cost to the State of supervising a parolee on release in the community is approximately $2,000/year, compared to $26,365/year to incarcerate a person).)

There are alternatives to the policy. The Court is of course aware that the intent of the Illinois Legislature, public safety, is a compelling state interest. The manner in which the defendants are administering the enacted corrective framework, however, unconstitutionally subjects indigent, homeless sex offenders to a loss of liberty for the solitary reason that they cannot afford rent. The defendants are capable of utilizing constitutional methods to effectuate the legislative purpose.

For instance, the defendants may demand that a determination be made in every case whether an offender made efforts to comply with the statute and failed to do so only because he or she was indigent. This is a process endorsed by the Supreme Court in *Bearden*, from which the defendants may take their cue. *See* 461 U.S. at 668–69, 72–73. An extension of that rule here would require the defendants to "consider alternate measures of punishment other than imprisonment. Only if alternate measures are not adequate to meet the State's interests in punishment and deterrence may the state imprison a releasee who has made sufficient bona fide efforts to pay." *Id.* at 672.

Moreover, the defendants are fully capable of monitoring and tracking homeless sex offenders. The legislatures of other states have provided the statutory means to record the whereabouts of homeless sex offenders. *See Adams*, 91 So. 3d at 742–44. In fact, so has Illinois:

> For purposes of this Article, the place of residence or temporary domicile is defined as any and all places where the sex offender resides for an aggregate period of time of 3 or more days during any calendar year. Any person required to register under this Article who lacks a fixed address or temporary domicile must notify, in person, the agency of jurisdiction of his or her last known address within 3 days after ceasing to have a fixed residence.
>
> A sex offender or sexual predator who is temporarily absent from his or her current address of registration for 3 or more days shall notify the law enforcement agency having jurisdiction of his or her current registration, including the itinerary for travel, in the manner provided in Section 6 of this Act for notification to the law enforcement agency having jurisdiction of change of address.
>
> *Any person who lacks a fixed residence must report weekly, in person, with the sheriff's office of the county in which he or she is located in an unincorporated area, or with the chief of police in the municipality in which he or she is located. The agency of jurisdiction will document each weekly registration to include all the locations where the person has stayed during the past 7 days.*

730 ILCS 150/3 (emphasis added); *see* 730 ILCS 5/3–3–7(a)(7.7) (mandating that certain sex offenders wear an approved electronic monitoring device); 730 ILCS 5/5-8A-3(g) (requiring some sex offenders to participate in an electronic home detention program for at least the first two years of their indeterminate MSR terms). The Illinois Legislature, then, anticipated and prepared for some sex offenders to be homeless. *Cf. People v. Wlecke*, 2014 IL App (1st) 112467, ¶ 31 ("This court . . . recognized that under the Act, '[a] person can be homeless by any normal standards and still have a 'fixed residence' if he or she has an occasional but predictable place to stay.'").

For good reason, too, because in reality law enforcement supervises many homeless sex offenders on release. *See, e.g., Regains v. City of Chicago, No. 15-2444*, 2019 WL 1147602, at *1–*2 (7th Cir. Mar. 13, 2019) (indicating that in a handful of

instances the sex offender registration form used by law enforcement listed releasees' addresses as "homeless," and as to the type of registration, officers checked a box for "homeless weekly"); *Beley v. City of Chicago*, 901 F.3d 823, 824–27 (7th Cir. 2018) (same); *People v. Scott*, 2017 IL App (4th) 150529, ¶¶ 7–8, *appeal denied*, 95 N.E.3d 484 (Ill. 2018) (same).

Undisputed evidence in this record establishes that the IDOC has been using GPS technology for over ten years. (Dkt. 91 ¶ 138.) The Department already requires sex offenders on supervised release to wear a GPS ankle monitor, in addition to a location tracker installed in their homes. (Dkt. 108 ¶¶ 138–39, 143; Dkt. 128 ¶¶ 143–47, 149.) What is more, the IDOC has no problems supervising violent releasees, including murderers, who it regularly releases into homelessness. *Id.* ¶ 141; Dkt. 107 ¶ 18. The technology seems to be working: one time, Jennifer Tyree's parole agent asked her why she stopped at a Steak and Shake on her way home from work. (Dkt. 128 ¶ 145.)[4]

This all makes sense after considering the Legislature's purpose in establishing mandatory supervised release: "facilitate[ing] reintegration back into society, a purpose distinct from serving time in prison." *See Round v. Lamb*, 2017 IL 122271, ¶ 21 (citing 730 ILCS 5/3-3-7(a) ("indicating that the conditions of MSR 'shall be such as the Prisoner Review Board deems necessary to assist the subject in leading a law-

---

[4] There are disputed facts in the record concerning electronic monitoring (not to mention internet use); however, the Court views them as immaterial on summary judgment and not implicated at this stage. To be clear, that does not mean the practices are not problematic. Perhaps the defendants will need to consider easing their confining exercise of discretion on those conditions to comply with the Court's order.

abiding life' and setting out a list of conditions for every parole and MSR that are designed for life outside of prison"); then citing 80th Ill. Gen. Assem., Senate Proceedings, Nov. 22, 1977, at 98-99 (statements of Senator Graham) ("discussing the legislature's intent to reduce recidivism and the benefit of maintaining custody over offenders for a period of time after they are released from prison")).

If the defendants continue to not release offenders who are supposed to be on mandatory supervised release, then it must demonstrate how that accomplishes the Legislature's goal of reintegrating the offenders into the community. Because it is the People's representatives and their intent in passing laws that matter, not the IDOC's and certainly not state or local police. (Dkt. 91 ¶¶ 12–13 (agreeing that the IDOC essentially delegates its authority to interpret the statutes to the state and local police).) To be sure, the IDOC does not write sex offender laws, but it does apply them. *See id.* ¶¶ 26, 50.

In exercising the discretion the Legislature entrusted it with, the IDOC must keep in mind the Legislature's central purpose of rehabilitation, which is evident throughout the statutory scheme. *See* 730 ILCS 5/3–14–2(b) (directing the IDOC to assign personnel to assist eligible individuals in preparing a parole plan and to report their efforts and findings to the PRB); 730 ILCS 5/3–14–3(1) (charging the IDOC with providing employment counseling and job placement services and empowering it to additionally assist in residential placement). The Supreme Court of Illinois has authoritatively interpreted this statute to mean that "the entity directed with assisting an inmate with finding a suitable host site for MSR placement is the Department of

Corrections," and that "the Department of Corrections is directed to *assist* inmates on MSR in finding residential placement, but is not directed to *obtain* residential placement for those inmates." *Cordrey v. Prisoner Review Bd.*, 2014 IL 117155, ¶ 24 (emphasis in original).

The Court recognizes that it has no warrant to dictate any alternative means to the defendants because it is entirely within their province to do so. The IDOC is free to develop whatever additional practices it wants to avoid the inadvertent wealth classification it has created while still satisfying the goal of public safety. The Court encourages the defendants to utilize their discretion to execute the Legislature's purpose in a constitutional manner that does not unfairly impact the indigent, homeless sex offenders who cannot by themselves obtain a host site upon the completion of their prison terms.

Thus, the way the defendants implement the statutory scheme here creates an illegal classification based on wealth, which indefinitely deprives the class members of their liberty as a result of their incapacity to pay. Though not facially discriminatory, it is discriminatory in its application and accordingly violates the Fourteenth Amendment to the Constitution. *Cf. Adams*, 91 So. 3d at 742 (citing *Griffin v. Illinois*, 351 U.S. 12, 17 n.11 (1956)). As a final word, the Court cautions that nothing in this opinion should be construed to entitle the plaintiffs to release—immediate or otherwise. All this Court now holds is that the defendants are currently applying the statutory scheme in an unconstitutional fashion. Any question of future propriety is not before the Court and one best saved for another day. The Court grants the plaintiffs'

motion for summary judgment (Dkt. 75) on their equal protection claim (Count II) and denies the defendants' cross-motion (Dkt. 88).

## III.   Procedural Due Process (Count III)

Moving to the plaintiffs' next claim, the Due Process Clause of the Fourteenth Amendment bars the government from depriving an individual of life, liberty, or property without due process of law. The procedural due process inquiry typically entails two steps: (1) whether the person has a protected life, liberty, or property interest; and (2) if so, what process is then due. This Court follows the Seventh Circuit's lead in approaching these claims in the correctional framework. *See Felce v. Fiedler*, 974 F.2d 1484, 1488 (7th Cir. 1992). First, courts must look to *Turner v. Safley* to define the extent of the liberty interest where prison regulations impede on constitutional rights. *See id.*; *Johnson v. California*, 543 U.S. 499, 510 (2005) (acknowledging that *Turner* applies to some due process claims). Second, if the inmate has such a liberty interest, courts must assess the constitutional sufficiency of the procedure used by employing the test laid out in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *See id.*

Starting with substance, a cognizable liberty interest may arise from the Constitution, statutes, or regulations. *See Felce*, 974 F.2d at 1488 (citations omitted); *Williams v. Lane*, 851 F.2d 867, 879–80 (7th Cir. 1988) (collecting cases). That said, the Due Process Clause—standing alone—is not the source of the liberty interest in parole, or in this case, supervised release. *See Felce*, 974 F.2d at 1489–90 (surveying the Supreme Court's due-process-in-parole jurisprudence, including *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1 (1978); *Morrissey*

*v. Brewer*, 408 U.S. 471 (1972); and *Board of Pardons v. Allen*, 482 U.S. 369 (1987)). Rather, "a state may create such an interest by state law." *Id.* at 1490. If a state does so, "a person serving a sentence of probation or parole has a limited liberty interest in his freedom that cannot be curtailed without the procedural protections of notice and hearing." *Werner v. Wall*, 836 F.3d 751, 760 (7th Cir. 2016) (citing *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973); *Morrissey*, 408 U.S. at 482).

The question becomes, then, whether the language and structure of the supervised release system in Illinois creates an expectancy of release, which would entitle releasees to conditional liberty. *See Montgomery v. Anderson*, 262 F.3d 641, 644 (7th Cir. 2001); *Taylor v. Edgar*, 52 F. App'x 825, 826–27 (7th Cir. 2002). Here, the answer is that it is common ground between the parties that the PRB in fact granted the plaintiffs their release. (Dkt. 91 ¶¶ 2, 3–5, 42–43, 52, 63, 73.) In so doing, the PRB essentially promised these individuals a form of statutory liberty that the IDOC could not thereafter "revoke" without appropriate procedures. *See, e.g.*, *Murdock v. Walker*, No. 08 C 1142, 2014 WL 916992, at *6 (N.D. Ill. Mar. 10, 2014); *Heidelberg v. Illinois Prisoner Review Bd.*, 163 F.3d 1025, 1026 (7th Cir. 1998). For this reason, the parole-revocation analogy (e.g. *Morrissey*) is an apt one. *Cf. Domka v. Portage Cty., Wis.*, 523 F.3d 776, 781 (7th Cir. 2008) (citing *Paige v. Hudson*, 341 F.3d 642, 643–44 (7th Cir. 2003), and contemplating other losses of freedom).

Accounting for *Turner*, the defendants neglected to identify conditions under which their interests outweigh a releasee's conditional liberty. True enough, the government's need to protect the community does not necessarily diminish over time.

*See Zadvydas v. Davis*, 533 U.S. 678, 690–91 (2001). The problem, though, is that the facts here come very close to sounding like preventive detention, which the Supreme Court has sanctioned "only when limited to specially dangerous individuals and subject to strong procedural protections . . . In cases in which preventive detention is of potentially indefinite duration, [the Supreme Court] [has] also demanded that the dangerousness rationale be accompanied by some other special circumstance, such as mental illness, that helps to create the danger." *Id.* at 691 (citations omitted). The government cannot hold a citizen indefinitely because he or she at one time committed a crime and therefore remains dangerous. *See Foucha v. Louisiana*, 504 U.S. 71, 85–86 (1992) (expanding that the reasoning weakens when the state argues as much for one class of offenders but not others).

It is not difficult to posit that the State's need to pursue legitimate correctional goals may more significantly limit the procedural protections the sooner after the PRB grants an indigent, homeless sex offender release rather than later. *Cf. Rasul v. Bush*, 542 U.S. 466, 488 (2004) (Kennedy, J., concurring in the judgment) (commenting that the government may be able to indefinitely detain someone taken from a hostile war zone for a matter of weeks, but as the period stretches from months to years, the justification becomes weaker). But here the defendants have detained at least two plaintiffs since their release dates in 2011, or, for over eight years. (Dkt. 91 ¶¶ 61, 80.)

In other words, the IDOC may elect not to liberate a PRB-approved indigent, homeless sex offender for some period, albeit not indefinitely. *See Zadvydas*, 533 U.S.

at 699 (avoiding a constitutional question by construing a statute to authorize deten-

tion only for a *reasonable* time consistent with effectuating removal from custody);

*Kansas v. Hendricks*, 521 U.S. 346, 363–64 (1997) (approving of statutory schemes

that provide for indeterminate detention so long as they provide for periodic *judicial*

review and entitle the detainee to release as soon as the defect ceases to exist).  In

this case, one class member wondered during his testimony whether the only way he

would ever get out of prison is by dying.  (Dkt. 91 ¶ 102.)  At least two more stated

that they felt like they would be trapped in prison for the rest of their lives.  Id.

¶¶ 108, 133.

Having determined that state law recognizes this liberty interest, the Court

must next address what procedural protections are necessary to ensure that IDOC's

decision to not release an individual already granted release is neither arbitrary nor

incorrect.  *See Felce*, 974 F.2d at 1496; *Lane*, 851 F.2d at 880 (citing *Wolff v. McDon-

nell*, 418 U.S. 539, 556 (1974)).  This evaluation requires courts to weigh several fac-

tors:

> First, the private interest that will be affected by the official action; sec-
> ond, the risk of an erroneous deprivation of such interest through the
> procedures used, and the probable value, if any, of additional or substi-
> tute procedural safeguards; and finally, the Government's interest, in-
> cluding the function involved and the fiscal and administrative burdens
> that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).  The utilization of the foregoing ana-

lytical model in this setting requires the Court to accommodate the plaintiffs' liberty

interests in serving their mandatory supervised release terms in the community and

the defendants' interests in facilitating the plaintiffs' reintegration into society while ensuring public safety.

Here, the problem is that there are a significant number of material facts that the parties genuinely dispute. The parties fundamentally disagree on whether there is a formal process in place for a person to contest the decision of a parole agent to deny approval of a host site. (Dkt. 91 ¶ 22; Dkt. 107 ¶ 29.) The defendants submit that an offender who wishes to contest the denial of a host site may file a grievance at his or her facility. (Dkt. 91 ¶ 22.) The plaintiffs call the defendants bluff on this point, asserting that the IDOC does not treat denials of parole sites as grievable issues. (Dkt. 107 ¶ 30.) For what it is worth, the defendants' witness testified that he did not know whether the denial of a host site is a grievable issue. (Dkt. 91 ¶ 22 (citing in part Pl. Ex. 14, Dep. of Dixon, at 114:20–115:3); Dkt. 107 ¶ 29; Dkt. 128 ¶ 160.) The record contains several illustrations of the IDOC refusing to review a host-site denial; in fact, the defendants did not come up with one example of a host-site denial being reviewed or overturned. (Dkt. 91 ¶¶ 26, 71; Dkt. 107 ¶ 29.)

That is not all. The parties also dispute whether the IDOC ever advises offenders of their right to contact the parole agent's supervisor to request review of the agent's decision, let alone gives them any information pertaining to how they can challenge an unfavorable disposition. (Dkt. 91 ¶ 23.) Consequently, it is unclear whether releasees are ever given this information. As it stands now, all that appears to be agreed on is that a releasee "has no opportunity to contest the parole agent's

decision(s) to reject proposed housing at a PRB hearing and the PRB does not review the IDOC's decision to reject proposed host sites." *Id.* ¶ 25.

Granted, the PRB does have a process in place to protect against a capricious taking of liberty: it is called revocation. *See* 730 ILCS 5/3-3-9(a)(3); *see, e.g.*, *Webb v. Godinez*, No. 14 CV 10281, 2017 WL 2653142, at *5 (N.D. Ill. June 20, 2017). In Illinois, the PRB—not the IDOC—has the power to revoke a releasee's MSR term for failure to comply with a condition, say, the host-site requirement. Absent a court order or an express statutory authorization to extend the duration of imprisonment beyond the original court-ordered term, then, the defendants are skating on thin ice. *See McNeil v. Dir., Patuxent Inst.*, 407 U.S. 245, 254 n.3 (1972) (criticizing detention beyond the expiration of a court-imposed sentence).[5]

The coercive power of the state is awesome, but it is not absolute. The defendants cannot chalk everything up to discretion and call it a day. Discretion without procedure leads to arbitrary governance, and eventually, the loss of liberty. That is what the Due Process Clause guards against. That is also what the separation of powers guards against. The Supreme Court has warned that "the Constitution may well preclude granting '"an administrative body the unreviewable authority to make determinations implicating fundamental rights."'" *Zadvydas*, 533 U.S. at 692 (quoting *Superintendent, Mass. Correctional Institution at Walpole v. Hill*, 472 U.S. 445, 450 (1985)).

---

[5] A court sentenced the first named plaintiff, Paul Murphy, to 36 months' probation. (Dkt. 91 ¶ 39.) Although imprisonment was not originally imposed on Murphy, he has been incarcerated—not to mention approved for release—for over eight years. *Id.* ¶ 42.

Notwithstanding the foregoing discussion, the record still remains riddled with disputed facts, so a trial will be necessary to determine whether the defendants offer the plaintiffs any procedure to determine whether a parole agent's rejection of a proposed host site was proper or not. Only then will the Court be able to decide whether that process is constitutionally sound. Accordingly, the Court denies both parties' cross-motions for summary judgment (Dkts. 75, 88) as to the procedural due process claim (Count III).

## IV. Eighth Amendment (Count IV)

Changing direction, the plaintiffs' last claim is that the defendants' application of the statutory scheme to them contravenes the Eighth Amendment to the Constitution. This analysis is separate and independent from the previous equal protection discussion. *See Harrington v. Scribner*, 785 F.3d 1299, 1307 (9th Cir. 2015) ("A prisoner's success on an equal protection claim is not dependent on whether the government met its obligations under the Eighth Amendment."). The claims do not compete, and the deference accorded to prison officials may very well differ under each provision. *See id.*

The Eighth Amendment generally limits the government's power to punish criminal offenders. The Supreme Court has explained that:

> The Cruel and Unusual Punishments Clause [of the Eighth Amendment] circumscribes the criminal process in three ways: First, it limits the kinds of punishment that can be imposed on those convicted of crimes, *e.g.*, *Estelle v. Gamble*, [429 U.S. 97 (1976)]; *Trop v. Dulles*, [356 U.S. 86 (1958)]; second, it proscribes punishment grossly disproportionate to the severity of the crime, *e.g.*, *Weems v. United States*, [217 U.S. 349 (1910)]; and third, it imposes substantive limits on what can be

made criminal and punished as such, *e.g.*, *Robinson v. California*, [370 U.S. 660 (1962)].

*Ingraham v. Wright*, 430 U.S. 651, 667 (1977). This case implicates the third iteration elucidated above—the substantive limitations on what the government may criminalize and therefore punish. The relevant distinction lies in applying criminal laws to punish conduct, which is constitutionally proper, and applying criminal laws to punish status, which is constitutionally improper. *See generally Powell v. State of Tex.*, 392 U.S. 514 (1968); *Robinson v. California*, 370 U.S. 660 (1962).

The plaintiffs argue that the defendants are punishing them because of their homeless status. The Eighth Amendment guides them, proscribing not just the criminal punishment of an individual's status, but also an individual's involuntary conduct otherwise inseparable from his or her status. *See Martin v. City of Boise*, 902 F.3d 1031, 1047–48 (9th Cir. 2018) (quoting and pulling from *Jones v. City of Los Angeles*, 444 F.3d 1118, 1137 (9th Cir. 2006), *vacated as moot following settlement*, 505 F.3d 1006 (9th Cir. 2007)); *State v. Adams*, 91 So. 3d 724, 753–54 (Ala. Crim. App. 2010); *Powell*, 392 U.S. at 567 (Fortas, J., dissenting) (declaring that "criminal penalties may not be inflicted upon a person for being in a condition he is powerless to change . . .").

It is not possible for homeless people to avoid sitting, lying, or sleeping in public because of their homeless status, at least where the evidence establishes that there is an absolute lack of available shelter space. *See Martin*, 902 F.3d at 1047–48; *Adams*, 91 So. 3d at 753–54 (discussing and borrowing liberally from *Jones*, 444 F.3d at 1131–38). That lack of housing is what drives the conduct from voluntary to

involuntary.  *See Martin*, 902 F.3d at 1047–48; *Adams*, 91 So. 3d at 753–54; *see also Joel v. City of Orlando*, 232 F.3d 1353, 1361–62 (11th Cir. 2000) (reasoning that there was unrefuted evidence of the availability of shelter space, meaning that the homeless person had an opportunity to comply with the ordinance, making his conduct voluntary).

In this case, the IDOC requires releasees to secure a qualifying host site to reside at while on MSR.  (Dkt. 91 ¶ 2.)  The IDOC exercises the sole discretion to approve or deny an inmate's proposed host site based on a variety of statutes and regulations that restrict where sex offenders may live while on MSR.  *Id.* ¶¶ 3–5.  Ultimately, a parole agent must authorize the placement.  *Id.* ¶ 4.  The only time a person can apply for the termination of his or her indeterminate MSR term is after successfully serving three years of that term outside of prison.  *Id.*  ¶ 5.

So, for someone who is homeless, it is virtually impossible to comply with the IDOC's application of the host site requirement.  (Dkt. 91 ¶ 38 ("'Q: Is it possible for a sex offender with an indeterminate MSR term who, A, does not have money to pay for his own housing, and, B, does not have family or friends on the outside who can pay for his housing [whether by living with them or paying for separate accommodations] to ever get out of the Illinois Department of Corrections? A: Never say never, but, . . . using those criteria, no.'").)

The undisputed evidence here establishes that the plaintiffs are indigent, that they have no family or friends with whom they can live, and despite their efforts, homeless shelters, halfway houses, and work-release programs are not permitted to

accept them as residents.  *Id.* ¶¶ 45–49, 64–65, 67–70, 74–77, 87–89, 92–95, 98–101, 104–07, 110–13, 116–19, 121–24, 126–28, 130, 132–33.  Furthermore, there are no halfway houses or transitional housing facilities in Illinois that will accept a convicted sex offender as a resident.  *Id.* ¶ 28; Dkt. 107 ¶ 25.

On top of that, the IDOC does not permit any sex offender to reside at a homeless shelter while on mandatory supervised release, nor does it allow them to participate in work release programs that it provides to other offenders.  (Dkt. 91 ¶¶ 29–30.)  For the plaintiffs, then, the failure to procure a host site is "not voluntary conduct merely related to, or derivative of, the status of homelessness, but [is] entirely involuntary conduct that [is] inseparable from [their] status of homelessness."  *Adams*, 91 So. 3d at 754.  Thus, the defendants' application of the host site requirement constitutes cruel and unusual punishment.

The defendants respond in the main that the State of Illinois is not charging the plaintiffs with a crime of being homeless, as other jurisdictions did in the cited precedent, prompting courts to strike down the operative statutes.  True, but this is a distinction without a difference.  All the Eighth Amendment calls for is punishment: a new indictment is of course sufficient; however, it is not necessary.  *Cf. Martin*, 902 F.3d at 1048 (referring to "criminal penalties"); *Diaz v. Lampela*, 601 F. App'x 670, 675–76 (10th Cir. 2015) (in relying on this case the defendants miss the mark because the court there appreciates that "*punitive incarceration* solely on the basis of a person's status or propensities violates the Eighth Amendment." (emphasis added)).

Prolonged incarceration is indeed punishment within the meaning of the Eighth Amendment. *See, e.g.*, *Courtney v. Butler*, No. 17-3310, 2019 WL 718888, at *1 (7th Cir. Feb. 13, 2019); *Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017); *Turner v. Godinez*, 693 F. App'x 449, 454 (7th Cir. 2017); *Werner v. Wall*, 836 F.3d 751, 760–61 (7th Cir. 2016); *Childress v. Walker*, 787 F.3d 433, 438–39 (7th Cir. 2015); *Burke v. Johnston*, 452 F.3d 665, 667 (7th Cir. 2006); *Campbell v. Peters*, 256 F.3d 695, 700 (7th Cir. 2001). Here, some plaintiffs have been kept in prison eight years past their release date. (Dkt. 91 ¶¶ 61, 80.)

The Seventh Circuit has, in fact, applied the status doctrine outside the normal context of criminal prosecution: in that case, probation. *See Sweeney v. United States*, 353 F.2d 10, 11 (7th Cir. 1965) (ruling that a probation condition is unreasonable if it is impossible to obey because the probationer has no power of volition and hence cannot abide by the condition). A revocation of supervised release (or here, a decision not to release) for the failure to comply with a condition of release is analogous to a criminal prosecution of a status offense. *Cf. United States v. Pinjuv*, 218 F.3d 1125, 1130–32 (9th Cir. 2000) (differing from this Court's view but granting that those conditions that do not contribute significantly to the remedial goals of supervised release will be invalid and unenforceable). The defendants' application of the host site requirement, while perhaps contributing to public safety, frustrates the rehabilitation process and is constitutionally void.

Because the substantive-limits claim carries the day, the Court need not reach the plaintiffs' additional and alternative argument that the challenged scheme

violates the Eighth Amendment by imposing a disproportionate sentence. The parties also briefed the issue of deliberate indifference earlier on in this litigation but have since seemed to abandon it in their reply briefs. The question of whether state of mind is a necessary element of a substantive-limits Eighth Amendment claim, as opposed to, for instance, a kinds-of-punishment claim (e.g. *Estelle*), is one not definitively answered by the case law. That might not come as a surprise because the Supreme Court applies the substantive limitation (proscribing punishment of a status) "sparingly." *Ingraham*, 430 U.S. at 667.

For what it is worth, none of the cases on this Eighth Amendment branch discuss deliberate indifference. In its standing analysis in *Jones*, the Ninth Circuit recognized as a general matter that when "the state transgresses this limit, a person suffers constitutionally cognizable harm as soon as he is subjected to the criminal process." 444 F.3d at 1129 (vacated as moot following settlement). A plaintiff with this species of claim, then, need only show that *objective* deprivation of liberty or property after the state overstepped the bound on its ability to criminalize. The Court appreciates, though, that this as-applied challenge is unique in the sense that the punishment is a post-conviction harm (extension of incarceration) and not a pre-conviction one. So, it is the jailers—not the arresters—that matter in this case, and *subjective* intent is generally a prerequisite in lawsuits against correctional staff (but not the police).

Assuming for the sake of argument that the plaintiffs must plead and prove deliberate indifference, the Court concludes that they have. *See Childress*, 787 F.3d

at 439–40. The defendants knew of this problem and the risk that they were inflicting unwarranted punishment (e.g. numerous lawsuits, admissions in this case, news media and other public records); they failed to act or took ineffectual action (indeed, their continued enforcement exacerbated it); and their response caused the unjustified detention (they chose to confine these individuals past their release date). *Cf. Burke*, 452 F.3d at 669. This awareness amounts to a reckless disregard of constitutional rights.

Once again, the Court notes that its decision relates to an as-applied challenge and it in no way purports to tell the defendants how to best administer mandatory supervised release for sex offenders. The Court does not order the immediate release of the plaintiffs, nor does it hold that the framework always operates unconstitutionally or that there are no set of circumstances under which it would be valid. The Court only holds that the host site requirement is unconstitutional under the specific facts in this case and as applied to the defendants. It remains the IDOC's job to appropriately exercise its discretion to achieve the goals of the state legislature in implementing mandatory supervised release for sex offenders. Accordingly, the Court grants the plaintiffs' motion for summary judgment (Dkt. 75) on the Eighth Amendment claim (Count IV) and denies the defendants' cross-motion (Dkt. 88).

## CONCLUSION

Sex offenders are criminals, plain and simple. Yet the "one enduring lesson in the long struggle to balance individual rights against society's need to defend itself against lawlessness," is that it "'is easy to make light of insistence on scrupulous regard for the safeguards of civil liberties when invoked on behalf of the unworthy. It is too easy. History bears testimony that by such disregard are the rights of liberty extinguished, heedlessly at first, then stealthily, and brazenly in the end.'" *United States v. Montoya de Hernandez*, 473 U.S. 531, 567 (1985) (quoting *Davis v. United States*, 328 U.S. 582, 597 (1946) (Frankfurter, J., dissenting)).

The Illinois Legislature thought it best to rehabilitate sex offenders by reintegrating them, like all other convicted felons, into the community after prison. The Constitution thus entitles them to the same conditional liberty that all other releasees receive. Because the defendants' current application of the host-site requirement permits the indefinite detention of the plaintiffs, it breaches the promises enshrined in the Bill of Rights. The Court accordingly grants the plaintiffs' motion for summary judgment (Dkt. 75) as to their equal protection (Count II) and Eighth Amendment claims (Count IV), denies it as to their substantive (Count I) and procedural (Count III) due process claims, and denies the defendants' cross-motion in full (Dkt. 88).

Although the Court today decides liability, it reserves ruling on the proper remedy to afford the plaintiffs. The Court sets a status hearing for 4/22/2019 at 9:00

a.m. to discuss a trial date for the procedural due process claim and the need for a remedial hearing to determine the scope of equitable relief.

Virginia M. Kendall
United States District Judge

Date: March 31, 2019