IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAUL MURPHY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 16 CV 11471 |
| | ) | |
| v. | ) | Judge Virginia M. Kendall |
| | ) | |
| KWAME RAOUL, Attorney General of Illinois, *et al.*, | ) ) | |
| | ) | |
| Defendants. | ) | |

**<u>DEFENDANTS' FOURTH QUARTERLY REPORT</u>**

On January 15, 2020, the Court entered a Permanent Injunction Order in this matter. Pursuant to that order, Defendants are required to present quarterly reports outlining steps taken to ensure that by March 20, 2021,[1] no *Murphy* class member remains in the custody of the Illinois Department of Corrections ("IDOC" or "the Department") due to an inability to locate a host site (Dkt. 156).

### I. Introduction

Over the last fourteen months, the Illinois Department of Corrections has worked diligently to comply with this Court's Permanent Injunction Order. The Department has taken innovative, unprecedented and aggressive steps to aid in the release of *Murphy* class members. The Department shifted its mindset and the mindset of its staff to become *release* focused. We've studied the research, collaborated with community partners and made a hefty financial investment into the *Murphy* class. Despite these efforts, the impact of COVID-19 cannot be ignored. This worldwide pandemic left destruction in its wake and neither IDOC nor the *Murphy* class were exempt from its devastation. COVID-19 all but halted movement across the United States. For months at a time, state and county offices in Illinois closed, preventing *Murphy* class members from taking crucial steps towards obtaining independence. In a state that boasts significant employment opportunities in the summer, the summer of 2020 saw a government initiated shut down and cancellation of all festivals and the closing of factories; all while the service industry became nearly non-existent. With these changes came the elimination of potential job opportunities for *Murphy* class members. The Department recognizes that there is still much work to do. We will move forward with a clear purpose and sincere intention to ensure that *Murphy* class members do not spend unnecessary time in IDOC custody.

---

[1] The Order sets a compliance deadline of January 2, 2021 (Dkt. 156), but the Amended General Orders 20-0012 extended all deadlines in existing cases by 77 days.

1

## II. Murphy Class

In January 2020, when this court entered its Permanent Injunction Order, there were 297 individuals in the *Murphy* class. Presently, there are approximately 210 *Murphy* Class members who remain in IDOC custody past the date of their Mandatory Supervised Release ("MSR"). This number of class members is an approximation as it fluctuates daily. Since the entry of the court's order, more than 178 *Murphy* class members have been released. Since April of 2019, more than 270 *Murphy* class members have been released. This is unprecedented progress by the Department and indicative of a genuine commitment to the class.

Since the last report to the court, 36 *Murphy* additional class members have been released and approximately 24 individuals have joined the class. Each month approximately 8 individuals join the class. Of the 210 *Murphy* class members, 33 individuals were released into the community, subsequently violated the terms of their MSR and were returned to IDOC custody. We also note that five *Murphy* class members were offered placement in the community as participants in the Intensive Community Reintegration Program ("ICRP") and declined. Additionally, there are three class members who we believe are appropriate for nursing home care, and we are working to find such placements for those class members.

## III. Steps the Department Is Undertaking to Release *Murphy* Class Members

### A. Collaboration with Stakeholders

As suggested in our initial compliance plan, the Department vowed to partner with advocacy groups and other stakeholders to evaluate and assist in reducing statutory restrictions. In furtherance this objective, since the entry of the Court's Permanent Injunction Order, the Department in fact collaborated with the Illinois Sentencing Policy Advisory Council ("SPAC"), Chicago400, the Illinois Justice Project and the Ohio Department of Corrections' Re-entry Housing Task Force. These collaborations brought the statutory restrictions facing the *Murphy* class to the forefront and forged a commitment to assist the Department in transitioning these individuals into the community.

In addition to working with advocates and stakeholders, the Department continues to discuss placement options of *Murphy* class members with the Illinois Department of Human Services ("IDHS"). As referenced above, there are three individuals who are appropriate for nursing home care. We continue to explore placement and services options for this group.

### B. Field Service Representatives

Field Service Representatives play an integral role in helping to identify compliant housing for the sex offenders in our custody. Not only are Field Service Representatives responsible for entering addresses in the system for parole investigations, they also arrange telephone interviews with potential landlords and schedule COVID-19 tests when required for

release. They are staunch advocates for their clients. Their dedication is pivotal to the Department's compliance with this Court's Permanent Injunction.

### C. Interstate Compact Placements

*Murphy* class members continue to submit requests to live in other states pursuant to the Interstate Compact. As a result of the COVID-19 pandemic, many states continue to refuse new transfers through the Interstate Compact. Going forward, the Department remains committed to working with our partners in other states to successfully transition *Murphy* class members into their desired out-of-state placements.

### D. Department's Shift in Focus: Expanded Host Site Considerations

When the Department began its journey towards compliance with this court's order, there was much work to be done with respect to host site considerations. There were numerous instances where host sites were inappropriately denied. Some *Murphy* class members with adult victims had potential host sites analyzed under statutory prohibitions applicable only to child sex offenders. Investigators were often fiercely technical in analyzing proposed host sites. These types of issues have all but vanished. As a part of our commitment to the *Murphy* class, training in parole department began from the top down. From the Chief of Parole, to the Deputy Chief of Parole, to the Commanders in the Sex Offender Services Unit (SOSU), to the agents responsible for host site investigations—each individual received training on statutory restrictions and their applicability to *Murphy* class members. As new case law dictated a change in policy with respect to internet use, additional training was provided. More fundamentally, these individuals were educated by IDOC leadership regarding the new direction of IDOC, a direction that focused on transitioning *Murphy* class members from prisons to placements in the community. This was a strong message from the head of Department's leadership.

After this messaging, the shift in host site approvals was plainly apparent. Almost immediately, our agents became quite flexible with previous host site restrictions. Gone are the days where host sites were denied because of the presence of computers, tablets and smart devices. Now placements are approved without having a landline telephone connection and *occasional* child visitors are no longer automatic barriers to placement. The SOSU continues to investigate the use of hotels and/or motels as potential host sites. We strongly believe that these types of changes will continue to benefit both the Department and the *Murphy* class for years to come.

### E. Collaboration with Plaintiffs' Counsel

Throughout the duration of the Court's Permanent Injunction Order, the Department continues to work collaboratively with Plaintiffs' counsel. They continue to assist the Department in identifying potential host sites for *Murphy* class members and continue to work in conjunction with the Department's Field Services Representatives to obtain approval for those placements. This joint effort serves to facilitate placement of *Murphy* class members into the community and prevents the possibility of re-arrest or reincarceration due to registration issues.

**F. Request for Proposal for Licensed Transitional Housing for Sex Offenders**

The Department posted two Requests for Proposal ("RFP") for licensed transitional housing for sex offender. The first RFP resulted in no responses. Not to be deterred, the Department successfully reposted the RFP and received two responses from two proposed vendors. Unfortunately, neither vendor could be approved through our procurement process. However, given the Department's success with the Intensive Community Reintegration Program (ICRP), we will continue to build upon that option to fund transitional housing for *Murphy* class members.

**G. Intensive Community Reintegration Program**

Fashioned out of the realization that the state's procurement process is both lengthy and arduous, the Department's Intensive Community Reintegration Program ("ICRP") was developed to assist *Murphy* class members transition into the community. The ICRP creates an avenue for the Department to provide transitional housing for the *Murphy* class on a smaller scale than an RFP and in a faster timeframe. The success of the ICRP rests solely on the Department's ability to establish and maintain relationships with community housing agencies. These relationships are not easily established, as there is a stigma associated with housing sex offenders. However, once the Department identified the ICRP as a goal, the Sex Offender Services Unit (SOSU) immediately began developing community relationships. This work began prior to the entry of the Court's Permanent Injunction Order and is an example of the Department's commitment to the class. It is through the diligent efforts of the SOSU that one community partnership has developed into four. These four community partners have provided the opportunity for 67 *Murphy* class members to begin serving their MSR in the community and IDOC currently pays for 63 Murphy class members to be housed with these community partners through the ICRP. The success of the ICRP is significant. This was an unprecedented move, as the Department has not funded any transitional housing for this population in many years.

Presently, the Department has contracts with four community agencies to provide housing for *Murphy* class members. Our community partners include New Beginnings, Walton Management, New Day Apartments and Hand in Hand.

New Day Apartments was the very first community partner established through the ICRP. Our work with New Day began with one location, housing just one registrant. Presently, there are eleven ICRP participants housed at five different New Day locations. In total, seven individuals have participated in the New Day's program and successfully reintegrated into the community. The Department is in its second one-year contract with New Day. The one-year contract is expected to cost the Department approximately $116,800. To date we have already disbursed nearly $180,000 in payments to New Day Apartments.

New Beginnings was the second entity to join the ICRP. The Department initially signed an emergency contract with New Beginnings. We are finalizing a formal contract with this

agency that is expected to cost the Department approximately $324,000 per year. During its tenure in the ICRP, New Beginnings has housed 26 *Murphy* class members in the community. Three individuals successfully transitioned from New Beginnings into their own compliant housing.

Walton Management is a fairly recent community partner. The contract with Walton Management spans three years and is estimated to cost the Department approximately $554,800. There are currently two *Murphy* class members housed in the community through Walton Management, and we expect to place more *Murphy* class members with Walton Management in the coming months.

The Department's most recent addition to the ICRP is Hand in Hand. While we initially planned to house only eight individuals in this program, there are currently 20 individuals housed with Hand in Hand. The contract with Hand in Hand is for five years and is estimated to cost the Department approximately $3,456,000.

When we initiated the ICRP, we expected that the transition of *Murphy* class members from the ICRP into their own housing would take approximately four months. This estimate was based on the belief that an individual could obtain employment within the first four to six weeks following release and could potentially save sufficient funds for housing in the following weeks. Had those predictions been accurate, well over 100 *Murphy* class members would have had the benefit of the ICRP. However, COVID-19 thwarted those expectations. While this program has seen its share of success, the ICRP participants were directly impacted by the pandemic.

Bryce Hill, Senior Research Analyst with the Illinois Policy Institute, analyzed the impact of COVID-19 on the Illinois job market. He notes specific disparities impacting low-income households, minorities and people with less education. In his February 19, 2021, piece entitled *Illinois' Poorest Hit Hardest by COVID-19 Job Loss, Many Still Unemployed*[2], he notes "COVID-19 made things worse for everyone – but even more for lower-income households." Hill goes on to say, "Illinois households earning less than $40,000 were four-times as likely to lose their jobs from February-April 2020 and nearly 11 times as likely to still be out of work compared to those earning $75,000 or more." This analysis is directly applicable to *Murphy* class members. While many Illinoisans were sent home from their office jobs during the pandemic, comparable options were not available to those in the service and/or manufacturing fields. COVID-19 disproportionately impacted individuals like those in the *Murphy* class who could not work from home and struggle most to find steady employment. Moreover, the additional legal barriers further impact employment opportunities for *Murphy* class members.

Despite the Department's best efforts, many *Murphy* class members remain in the ICRP program because of their inability to find employment and consequent inability to secure their

---

[2] Bryce Hill, *Illinois' Poorest Hit Hardest by COVID-19 Job Loss, Many Still Unemployed*, Illinois Policy (Feb. 19, 2021), available at www.illinoispolicy.org/illinois-poorest-hit-hardest-by-covid-19-job-loss-many-still-unemployed/ (last visited March 12, 2021).

own compliant housing. These individuals will be allowed to remain in the program and will be offered continued supportive services in an effort to help them identify employment and housing. There is still reason for optimism. The Department plans to continue to add additional ICRP beds and build upon expressed interest by current ICRP vendors to expand current operations.

### H. Conclusion

The Department spent the last fourteen months fiercely committed to complying with this Court's Permanent Injunction Order. We are pleased that our unprecedented efforts have led to the release of 178 *Murphy* class members. We strongly believe that but for COVID-19, our efforts would have resulted in more releasees. Nevertheless, our commitment remains strong.

The Department continues to take extraordinary steps with respect to this population. While we have not completely eliminated *Murphy* class members from our facilities, the population is being released into the community at a remarkable rate.

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

By: */s/ Sarah H. Newman*
Sarah H. Newman
Assistant Attorney General
100 W. Randolph Street, 13th Floor
Chicago, Illinois 60601
312-814-6131
snewman@atg.state.il.us

*Counsel for Defendants*